## COURT OF APPEALS,

### Nov. 5 1910

# THE PEOPLE v. VINCENZO LEONARDO.

### (199 N. Y. 432.)

(1.) MURDER—EVIDENCE SUSTAINING VERDICT.

It was properly left for the jury to say whether the defendant was guilty of the crime of murder with which he is charged. He has been found guilty and the judgment should not be set aside as against the evidence.

(2.) SAME—COLLATERAL TESTIMONY ELICITED FROM DEFENDANT UPON CROSS-EXAMINATION.

While the prosecution is bound by testimony elicited from defendant upon his cross-examination as to collateral facts, yet, when the defendant voluntarily assumes to make such collateral issue a material one by calling a witness to testify with reference thereto, he is not in a position to complain that a witness is called by the prosecution to contradict such testimony, particularly when the witness for the prosecution did not give any testimony in direct contradiction of the witness called by defendant.

(3.) SAME—RES GESTAE.

The deceased was stabbed in rooms occupied by defendant. *Held*, that evidence of an exclamation made by him after he had reached the street and he was being led away from the immediate scene of the crime was part of the *res gestae*.

(4.) SAME—EVIDENCE EXCLUDED AFTERWARDS ADMITTED BY DEFENDANT'S CONSENT.

Evidence objected to by defendant's counsel and excluded is afterward properly admitted upon his complete, unequivocal and intentional consent that it may be received.

(5.) SAME—NOT ERROR FOR DISTRICT-ATTORNEY TO CALL ATTENTION TO FACT THAT DEFENDANT'S FATHER WAS NOT CALLED.

Defendant's father was in a position, at the time of the homi-

cide, so that he could have given some testimony relating to the
occurrence. *Held*, that it was not error for the district attorney to
call the attention of the jurors to the fact that defendant did not
call him as a witness.

APPEAL from a judgment of the Supreme Court, rendered
January 25, 1910, at an Extraordinary Trial Term for the
county of Albany upon a verdict convicting the defendant of
the crime of murder in the first degree and from an order deny-
ing a motion for a new trial.

The facts, so far as material, are stated in the opinion.

*John H. Gleason* and *Joseph A. Murphy* for appellant.
The admission of testimony as to declarations of deceased con-
stitutes reversible error. (*Lahey* v. *Ottman & Co.,* 73 Hun, 61;
*People* v. *Del Vermo,* 192 N. Y. 470; Wharton on Homicide
[3d ed.], § 629; *People* v. *Shaw,* 3 Hun, 272.) The producing
of John H. Farrell and his evidence was highly prejudicial to
the defendant and constitutes reversible error. (*People* v.
*Greenwald,* 108 N. Y. 296; *People* v. *De Garmo,* 179 N. Y.
130; *People* v. *Brown,* 197 N. Y. 288; *People* v. *Molineux,* 168
N. Y. 264; *People* v. *Webster,* 139 N. Y. 73; *Cosselman* v.
*Dunfee,* 172 N. Y. 507; *People* v. *Wolf,* 183 N. Y. 475;
*People* v. *Cascone,* 185 N. Y. 317.) The district attorney's
reference in his summing up to the defendant's father as the
one living eye witness to this tragedy, who is not here, was
wholly unwarranted and highly prejudicial to the defendant.
(*Tauger* v. *N. Y. C. R. R. Co.,* 104 N. Y. Supp. 681; *Robinson*
v. *Met. St. Ry. Co.,* 103 App. Div. 243; *People* v. *Hinksman,*
192 N. Y. 421; *People* v. *Wolf,* 183 N. Y. 464.)

*Rollin B. Sanford, District Attorney,* and *Harold D. Alex-
ander* for respondent. The statement of deceased to Officer
Church was properly admitted as part of the whole transaction.
(*People* v. *Del Vermo,* 192 N. Y. 470; *Comm.* v. *Werntz,* 161

*Penn. St.* 591.)   Defendant's failure to call his father was strongly corroborative of the People's witnesses and was suspicious and inferential, and the People had the right to comment on it.   (*Gordon* v. *People,* 33 N. Y. 509; *Bleecker* v. *Johnson,* 69 N. Y. 311; *Minch* v. *N. Y. & Q. Co.,* 80 App. Div. 325.)

CHASE, J.   The defendant was jointly indicted with Dominico Ferrara and charged with the crime of murder in the first degree, committed October 2, 1909, by stabbing George E. Phelps and inflicting upon him such wounds as to result in his death.   Ferrara was separately tried and found guilty.   An appeal was taken from the judgment of conviction, and this court has affirmed his conviction, and the opinion in connection therewith is handed down with the opinion in this case.   We refer to the opinion in that case (*People* v. *Ferrara,* 199 N. Y. 414, 26 N. Y. Crim. *ante* for a description of the building occupied by the defendant, and of what was found in it after the homicide; also to the evidence mentioned therein so far as it was given by the surgeon who made the autopsy upon Phelps; the defendant's barkeeper; the man who was passing the saloon at the time of the homicide and the car inspector, all of whom were sworn on this trial and testified substantially the same as they severally testified on the trial of Ferrara.   The theory of the prosecution on this trial is not changed from the theory as stated in the opinion in that case.

The defendant in this case admits, as we will state in greater detail herein, that he was present in the storeroom when the crime was committed, but he testified that he is wholly innocent of any crime in connection with the occurrences, and he further testified that the crime was actually committed by Ferrara.

The proceeds of the lodgings had not been sufficient to give to the defendant and his parents the money required or needed by them.   It appears that the defendant pawned his watch and

chain on the previous July 3, and with the amount received purchased a pair of shoes. On July 9 he pawned for his mother a watch, two chains and several rings, upon which he received $40 and gave it to her. On September 7 he pawned a ring of his and also a watch left by a lodger, upon which he received $2.75. No part of the property was ever redeemed. On September 27 his mother wrote him from Oswego, where she was at that time, as follows: " I have received a letter from your father in which he tells me that you have not even a cent. I will send the money and when I will send you the money I want the jewelry sent." No money was received by him from his mother, and he testified that when about to go into business on October 1 he had about $20. A brewery obtained for him a liquor tax certificate, became responsible for the bond, and put in the bar and floor fixtures and did the plumbing work, and trusted him for it. The defendant put in some glasses and other things, and obtained thirty days' credit for their payment. He had to pay $10.80 to have the gas meter put in. The brewery furnished him the beer, and he purchased the liquors and cigars on credit. He testified that he had $95 toward the rent on Friday, but how he obtained it does not appear. He says the receipts of the bar Friday night were $12. On Saturday he had to pay the landlord $113. He says he expected a bill that day from the brewery, and that he then had a bill to pay for liquors of $18. The prosecution contends that the defendant's financial necessities led him to commit the crime.

The prosecution, among others, called as a witness a young man who worked for the defendant. He testified that he was in the barroom Saturday afternoon when Phelps came in and at that time there was no one there except the defendant and his father; that the defendant sent him away on an errand and that he returned in twenty or twenty-five minutes; that there was no one in the barroom and he went into the sitting room; that the defendant's father was in the sitting room and he

asked him where Vincent was and he replied that he didn't know; that he sat down but got up and started upstairs; that he got as far as the hall and saw the defendant standing in the doorway of the storeroom; that the door was about half open and he heard someone counting money; that he asked the defendant what was the matter and that he replied " nothing; " and that he then went back to the sittingroom.   He further testified: " I didn't have any more time to get back where his father was and sit down on a chair until Vincent's father jumped up and said ' Fight,' and he went out through the saloon and I followed him and got as far as the end of the bar; then Phelps staggered out into the hallway; and when he staggered out in the hallway why Jim Hines came in with a pail for a pint of beer.   I seen Phelps, he was all covered with blood and Vince had hold of him.   He had hold of his coattail and had him up here(ind.) along in the back.   Phelps was in front.   His coat was ripped clear up the back.   They were right in the doorway of the poolroom when I first saw them.   Phelps started out in the hallway and he put his arm—we had a little office there—like that, to pull himself up, and then he reached over and got hold of the side of the door, the saloon door that comes out of the hallway into the saloon, and he reached over and got hold of it and pulled himself up.   I heard him holler ' Murder ' and he said ' Don't kill me and I will give you the money.'   *   *   *   They came right across the hallway into the saloon and right out through the saloon and right out to the Broadway door.   Jim Hines went out right ahead of him.   That is we all went out beside Phelps; Phelps went out right after Jim Hines ran out.   Vincent went as far as the Broadway door and he let loose of him, and he went back.   The Broadway door was open.   Vincent went back into the poolroom and through the poolroom and around where that blind stairway is.   I heard the water running in there.   He had blood on his face and his hands.   I   didn't have any conversation with Vincent after that, only there was an Italian next door

and I heard her asking something of him; I don't know what she asked him. They talked in Italian. When this lady talked to him he turned around to me and said, ' You don't know nothing about it ? ' I said, ' No.' " He also testified that he did not hear the defendant say anything during the occurrences related.

Hines, the man referred to by the defendant's employee mentioned, testified that he came into the barroom about half-past two and that he saw Phelps coming out of the storeroom; that defendant was holding him; that Phelps was hollering " Murder; " that Phelps went out of the door and the defendant went back in the kitchen and gave him (the witness) a shove up against the bar and said, " Get out of the way," and that he was frightened and ran out.

A young man who had been a lodger at the defendant's house and was familiar with the rooms went in them a short time after the homicide and he testified that he saw a knife with a blade about five inches long lying in the west end of the hall in a little space under the stairs. He further testified that he was at the police station when the defendant was there and that he saw the defendant putting a knife holder down inside his trousers and that a short time after when the defendant walked down to the desk at the station the knife holder dropped out of his trousers upon the floor and was picked up by one of the officers.

At the police station the defendant said that he was alone in the room with Phelps and had paid him the rent money when a fellow ran in through the hall from the street and grabbled the money and stabbed Phelps and ran out through the hall again into the street. He further testified that he did not know the man and had never seen him before.

Officer Church, who at the time of the homicide was on duty in that part of the city including the corner of Broadway and Madison avenue, testified that he was at the defendant's saloon at two o'clock on Saturday to see why his license was not framed

and in the window where it could be seen. It appears that the errand upon which the defendant's employee was sent about two o'clock was to get a frame into which to put the license. The officer mentioned further testified that he arrived at the saloon after the homicide about fifteen minutes to three; that he found Phelps covered with blood leaning against a building across the street from the saloon; that he talked with him, and that Phelps said, " The young man that run the place was the only one in the room with him," and witness asked him if he (the young man) stabbed him, and that Phelps said: " It must have been him. He was the only one in the room."

The defendant's counsel cross-examined such officer at length, and in answer to questions the officer testified that Phelps said, " They got his watch, his money, and his bills and his hat." And he further testified that he went with Phelps in the ambulance to the hospital, and that on the way to the hospital he questioned Phelps further, but did not get any other reply. In answer to further questions by the defendant's counsel it appears that at the hospital Phelps made a statement in the presence of the physicians and nurses which was taken in writing by one of the physicians. One of the attending physicians at the hospital testified that he heard the statements made by Phelps and transcribed them on a regular sheet to be filed as a part of the hospital records. The statement so transcribed is as follows: " Patient was counting money in 228 Broadway in a room off bar; was hit in head. Doesn't know who hit him. Says only one man who was in the room was the young man who runs the place; young man, smooth face; thinks he has no mustache. He (Phelps) pulled a knife out of his neck and dropped it; when next he remembers the young fellow had him by the coat and was trying to drag him by the coat. He says he got out of the place then."

The defendant was sworn in his own behalf and testified that Phelps came for the rent about nine o'clock Friday morn-

ing; that he didn't pay it because he didn't have all the money; that he told Phelps to come the next day; that on the same Friday another person came to collect the rent and that he told him to come the next day; that about noon on Saturday he saw the owner of the property on the street and told his barkeeper to tell him to send a man for the rent; that between two and three o'clock Phelps came and they walked inside the storeroom; that behind the door was the little desk; that he put the money on the desk; that Phelps sat down and commenced counting the money. The defendant's account of what then occurred is as follows: " We had about over half the amount counted and all at once I see one hand rush in quick, you know, and Mr. Phelps grabbed his hand and I turned around at the same time, too, and I seen he had in the hand, I don't know how many inches, a knife, and stick the man, you know the same time I turned around he stick him, and I got afraid. Well, I don't know; I couldn't move myself. I went under the table, and when I went under the table Phelps the same time got one side and he kicked me and turned me around and I went under the table, and while I turned around to get up again the fellow run out.

" (Witness stands up.) When I got up I turned around (illustrating) and he went out, and I went for Phelps and got him from behind and tried to lift him up, and of course I couldn't lift him up, but I help lift him up. When I raise him one foot slip and all the balance was on me, and he made a little move and his foot brought him up, and after that I got him out to the door near the office and he wanted to go out through the hall and he got weak there and he got hold of the frame in the office to go out; I didn't want to let him go out through the office, outside through the hall; well, he got weak there and I done the best I could; I had him at the waist right there (ind.) and I turned around and brought him in the barroom, and then he didn't want to stay any longer in

the barroom, he wanted to go out.  I was holding him and he wanted to go out; I didn't want to let him go out, outside; I don't know; he carried me with him outside.  *  *  * I didn't grab the man myself because I couldn't; I was afraid; the position I was in I had to get out of the way. When I got up, and before I took hold of Mr. Phelps, I saw the man, but he ran out and he pointed his finger to his nose; I understand what that means, to shut up."

He further testified that the man was Ferrara; that at first he denied knowing the man, because he was afraid of the Ferraras if he told the truth about the occurrence; that he talked with Ferrara two days before about the amount of his rent, and that about an hour before the homicide he saw Ferrara alone on the corner outside the saloon; that the knife shield produced in evidence he picked up from the floor of the storeroom after the homicide and put it in his coat pocket, and that it fell from his coat pocket when he was in the police station and not from his trousers; that the lodgers came downstairs and that the hall was full when he left Phelps on the sidewalk; that he laid the hat on one side and put the eye glasses in it.  Neither the defendant's father nor any of the lodgers that came down into the hall were sworn.

The defendant, referring to the hole below the floor in the backroom, testified that he dug it about two months before October 2, because the water rent for his house was so much that he thought that if he dug the hole he might find that the pipe leading to certain closets on an adjoining property connected with his pipes in such a way that the water passed through his meter.  He further testified that he did not find any water pipes when he dug the hole, and that he left the hole as he had made it.

It appears from other testimony that there had been some objection to the amount of his water tax, but the diagram in evidence does not indicate that a hole dug in the soil at the

place where it was dug would probably result in finding such pipe if it existed.

The defendant also called the two women that were sworn on behalf of the prosecution in the Ferrara case, and they gave testimony substantially the same as the testimony given by them in that case.

We are of the opinion that the evidence in this case was properly left to the jury for them to say whether the defendant was guilty of the crime beyond a reasonable doubt. They have found the defendant guilty and the judgment should not be set aside as clearly against the evidence.

The defendant's counsel calls our attention to certain exceptions taken by him to rulings of the court during the trial which he urges were prejudicial to the defendant and that require that he should be given a new trial.

*First.* The defendant upon his cross-examination was interrogated by the district attorney about certain jewelry and he testified that it was owned by his mother and that he pawned it for her on July 9. After referring to a cameo ring, a part of such jewelry, he testified that he did not know that engraved on the inside of it are the initials " J. H. F." He further testified that he heard that John H. Farrell's place, which is about a block and a half from the Leonardo building, was burglarized and that jewelry was taken therefrom on May 31, 1909; that he did not steal the ring and that his mother wore the ring months before May 31.

The prosecution was bound by the testimony so elicited upon such collateral facts. (*People* v. *Greenwall,* 108 N. Y. 296; *People* v. *De Garmo,* 179 N. Y. 130, 18 N. Y. Crim. 430; *Potter* v. *Browne,* 197 N. Y. 288.)

The defendant's counsel was not content to leave the testimony upon such collateral matters as it then stood, but he called the defendant's mother as a witness and she testified in answer to questions put by him that she owned the cameo

ring mentioned and that she purchased it of a lodger at their house about six and a half months before it was pawned.

After the case for the defendant had been closed the prosecution called John H. Farrell in rebuttal and he was asked a question as follows: " Q. Did anything occur at your place of business sometime this year out of the ordinary?

" A. Well on the 31st of May ——."

The defendant's counsel, interrupting, said: " I object to this as incompetent and irrelevant and proving or attempting to prove another crime not alleged in this indictment and as inadmissible under this indictment, and I make the objection only for the purpose of saving the defendant's legal rights." And the district attorney replied, " Very well, we will pass it."

Thereafter the district attorney asked the defendant other questions as follows: " Q. Do you recognize the ring with a cameo?

" A. Yes, sir.    *    *    *

" Q. How do you recognize it?

" A. It has ' J. H. F.,' my name, on it."

The defendant's counsel then said: " I object to it as incompetent, immaterial and inadmissible under this indictment," and the district attorney replied, " We will pass it then," and the court said, " It is passed and not in." After a further statement by the defendant's counsel the court again said: " He has passed it.  It is out."

The rule is well settled that a party cannot contradict testimony elicited by him on a collateral matter, and if the defendant's counsel had not called his mother to give affirmative evidence of her ownership of the ring there would have been no justification for calling Mr. Farrell as a witness. When the defendant called his mother and questioned her in regard to the ownership of the ring, he voluntarily assumed to make the collateral issue a material one. The prosecution called

Farrell for the apparent purpose of contradicting the defendant's mother and of showing that he was in possession of the cameo ring until the 31st of May. The question before us is not as to what ruling the court should have made to objections to questions to Farrell relating to his ownership or possession of the ring but whether the defendant has been prejudiced by reason of the prosecution calling Farrell as a witness and asking him the questions quoted.

In view of the position taken by the defendant's counsel in regard to such collateral issue, he is not now in a position to complain because the prosecution called Farrell, particularly as Farrell did not give any testimony in direct contradiction of the testimony given by the defendant's mother. (*Blossom* v. *Barrett,* 37 N. Y. 434, 438.)

*Second.* The testimony given by the car inspector as to what Phelps said to him and in his presence was objected to on the part of the defendant's counsel upon the grounds that such testimony is hearsay, incompetent and inadmissible, and it was received subject to such objections and exceptions.

The testimony so given by him was a mere statement of facts that at the close of the case were conceded, except the statement that Phelps said " The receipts, the receipts, the receipts are gone," and such statement was an exclamation made by Phelps as he was being led away from the immediate scene of the crime and as he opened his coat and put his hand in his pocket. Such testimony was a part of the *res gestæ* within our decision in *People* v. *Del Vermo* (192 N. Y. 470). This court in that case carefully considered the question as to what evidence should be received as a part of the *res gestæ,* and it is not necessary to discuss the question further, so far as it relates to the testimony of the car inspector.

The defendant's counsel also objected to the testimony given by Officer Church as to what Phelps said to him about fifteen minutes after the homicide and while he was on the street wait-

ing for the ambulance, upon the ground that such evidence is incompetent, improper and hearsay, and inadmissible under the indictment. The objections were overruled and the testimony was received subject to an exception. On the cross-examination of Officer Church the defendant's counsel asked him what statements Phelps made to him on the way to the hospital in the ambulance, and he also elicited from the witness that Phelps made a statement when he arrived at the hospital and that the same was transcribed upon paper and is kept at the hospital. Subsequently the attending physician at the hospital was called as a witness and he was asked whether Phelps made any statement at the hospital and he replied in the affirmative, and after some discussion a question was asked as follows: " Q. What did you do ? " and the record of what then occurred is as fol-- lows: " Defendant's counsel: I object   *   *   * as somewhat leading to a professional man in a case of this kind and I suggest that the Court confine the learned Assistant District Attorney to letting this man state in his own way all that took place there unless I object to it.

" The Court: I will let him answer the question.   *   *   *

" A. Transcribed them on a sheet, on a regular sheet of the hospital paper.

" Q. What became of that piece of paper ? A. It presumably has been filed with the hospital history.   *   *   *

" Q. What was the substance of that conversation, the questions and the answers ?

" Defendant's attorney: I object to that as hearsay, incompetent and inadmissible under the indictment, because it cannot be any part of the *res gestœ;* not made at the time or place but several—but several hours, or at least an hour after the alleged occurrence and after this man had been removed and before it is shown what occurred at the hospital, what condition he was in, what treatment, if any, he had received or anything as to his state, physical and mental, at the time

that this claimed statement was made, and I desire to ask the doctor at this stage a few preliminary questions. * * *

" The Court: What do you say as to its being competent to corroborate the witness you have just been cross-examining ? "

There was then some further discussion about the proposed evidence being in the nature of an ante-mortem statement, and the court said: " It would be excluded for that purpose, it is not offered for that purpose and I think it will have to be excluded as a part of the *res gestæ.*" The district attorney then excused the witness. That would have ended the testimony of the hospital physician but the defendant's counsel concluded that he preferred to have the statement in evidence and said: " Of course, if your Honor please, there are trying situations which grow up in a case when it becomes necessary for the attorney for the defense and for the prosecution in order to save the rights of clients at a future day or time, it is necessary to have legal rulings in the case and exceptions. * * * This case has been no exception on our part or on the part of the district attorney. I think in view of the situation and all that surrounds this case that everything that occurred that may possibly throw any light on this case shall be given to these men (ind. the jury). I, therefore, consent that he go on with this witness."

Another discussion occurred between the court and counsel and it was agreed that the written statement on file at the hospital should be received in evidence as the statement made by Phelps. The defendant's counsel then, summing up his position, said: " I adhere to that attitude and I consent that everything be testified to and that this be received in evidence. I also consent that the doctor may read it to the jury now." The statement was then read to the jury.

The statement made by Phelps at the hospital, and the one made by him to Officer Church, so far as they pointed to the defendant as the person who committed the crime, are sub-

stantially alike.  Both statements are essentially statements
of fact and not of conclusions and substantially that Phelps
did not know who hit him, but that the defendant was the
only man in the room.  If the defendant was the only man in
the room when Phelps was hit no other person could have
committed the crime and the asserted conclusion in the state-
ment to Officer Church is a matter of course.

The evidence of the physician as to Phelps' statement at
the hospital was taken after the court had decided in the
defendant's favor excluding such testimony.  Such statement
cannot fairly be said to have been in explanation of the state-
ment made by Phelps to Officer Church or to have been required
simply because the jury might draw an inference against the
defendant if his counsel objected to the receipt of such testi-
mony.  Phelps' statement to Officer Church was already in
evidence and it included facts that directly charged the defend-
ant with being the one with him when the crime was com-
mitted.  Such testimony had been received subject to objections
and exception in a way that the defendant could avail himself
of it upon appeal if such ruling was erroneous.  A more in-
criminating statement by Phelps at the hospital was not to have
been anticipated by counsel or assumed by the jury.  There
was at that time no force or reason that compelled the defend-
ant's counsel to consent that the evidence be received.  His con-
sent was on its face, and, in fact, complete, unequivocal and
intentional.

It is not necessary to consider whether the statements by
Phelps to Officer Church were a part of the *res gestæ,* because
the jury had before them by consent similar testimony, and
an error, if any, in the admission of the testimony of Officer
Church was cured.

*Third.* It is claimed that the defendant was also prejudiced
by reason of the district attorney calling the jurors' attention
to the fact that he did not call his father as a witness.  It

would be natural to suppose that the defendant could have produced his father as a witness if he had so desired, and it appears that his father was in a position at the time of the homicide so that he could have given some testimony relating to the occurrence.

It was not error to call that fact to the jurors' attention for their consideration.

The judgment of conviction should be affirmed.

CULLEN, Ch. J., GRAY, HAIGHT, VANN, WILLARD BARTLETT and HISCOCK, JJ., concur.

Judgment of conviction affirmed.