UNITED STATES v. WILSON et al.

(District Court, D. Oregon. March 24, 1894.)

No. 3,594.

1. CONSPIRACY—INDICTMENT—LANDING OF CHINESE LABORERS.
    An indictment under Rev. St. § 5440, charged a conspiracy to commit the offense of aiding and abetting the landing of Chinese laborers not entitled to enter the United States by furnishing them with false and

fraudulent evidence of identification. *Held,* that this is a sufficient allegation of a conspiracy to furnish such evidence, and that the indictment is not open to the objection that it describes but does not charge the offense named.

2. SAME—CONCLUSIONS OF LAW.

An indictment charged a conspiracy to aid and abet the landing in the United States from certain vessels named, "plying between the port of Portland, Oregon, and Vancouver, in the province of British Columbia," of Chinese laborers "not entitled to enter the United States." *Held* that, even if the last-quoted words stated a mere conclusion of law, in that they did not show that such Chinese were brought from a foreign port, yet this fact sufficiently appeared from the preceding words.

3. SAME—OVERT ACTS.

Under an indictment charging a conspiracy to aid and abet the landing from certain vessels named of Chinese laborers not entitled to enter the United States, it is immaterial whether any Chinese laborers were in fact landed as a result of the alleged conspiracy, if the criminal agreement was entered into, and any of the overt acts alleged was committed.

4. SAME—EVIDENCE.

On trial under such an indictment, the manifests of the vessels named, describing the Chinese passengers landed during the time of the alleged conspiracy as merchants, are not evidence of that fact, as such statements were necessarily derived from information furnished by the passengers themselves.

5. WITNESS—COMPETENCY—PLEADING GUILTY OF CRIME.

A mere plea of guilty by a conspirator does not render him incompetent to testify against his confederates. A judgment of conviction is necessary to produce that result.

This is an indictment under Rev. St. § 5440, against John Wilson, C. J. Mulkey, William Dunbar, P. J. Bannon, and others for conspiracy to commit the offense of aiding and abetting the unlawful landing of Chinese laborers in the United States. Defendants Mulkey, Dunbar, and Bannon were found guilty, and moved for a new trial.

Daniel R. Murphy, U. S. Atty., John M. Gearin, Sp. Asst. U. S. Atty., and Charles J. Schnabel, Asst. U. S. Atty.

Rufus Mallory and Alfred F. Sears, Jr., for defendants.

BELLINGER, District Judge. The indictment in this case is for a conspiracy, under section 5440, Rev. St., to aid and abet the landing of Chinese persons in the United States, in violation of section 11 of the amendatory act of July 5, 1884. That section is as follows:

"Sec. 11. That any person who shall knowingly bring into or cause to be brought into the United States by land, or who shall aid or abet the same, or aid or abet the landing in the United States from any vessel, of any Chinese person not entitled to enter the United States, shall be deemed guilty of a misdemeanor, and shall on conviction thereof be fined in a sum not exceeding one thousand dollars and imprisoned for a term not exceeding one year."

The indictment charges that the defendants conspired together to commit an offense against the United States, to wit, the offense and misdemeanor of knowingly and unlawfully aiding and abetting the landing in the United States from a vessel, to wit, the steamship Wilmington and the steamship Haytian Republic, both

steamships plying between the port of Portland, Or., and Vancouver, in the province of British Columbia, dominion of Canada, Chinese persons, to wit, Chinese laborers, not lawfully entitled to enter the United States, by furnishing such Chinese laborers false, fraudulent, and pretended evidences of identification, and by counseling, advising, and directing said Chinese laborers and furnishing them information and advice touching the questions liable to be asked them upon their application for admission to land from said vessels, and by various other means to the grand jury unknown. It is further alleged that on July 28, 1892, and on June 14, 1893, and on various other dates between said July 28th and June 14th, in pursuance of such conspiracy, there was unlawfully brought from British Columbia, Canada, in the steamship Haytian Republic, into the port of Portland, Or., and landed there, a large number of Chinese laborers, the number and names of which are unknown, and that in like manner, and between the same dates, other large lots of Chinese laborers were brought here and landed in pursuance of the conspiracy from the steamship Wilmington. The indictment also alleges the making, on dates that are named, of fraudulent certificates by the defendants Holman and Bannon, in pursuance of the conspiracy, and their delivery to Blum for use in furtherance of the conspiracy.

The jury were unable to agree as to the defendants Lotan and Seid Back. Mulkey, Bannon, and Dunbar were found guilty, and the rest of the defendants were found not guilty. Mulkey, Bannon, and Dunbar filed a motion for a new trial upon various grounds, but mainly upon the ground that the indictment does not state facts sufficient to constitute a crime, and the questions for decision arise upon such motion.

It is contended in support of the motion that the allegation that the defendants conspired to aid and abet the landing of Chinese persons describes, but does not charge, the offense for which the defendants were tried; that the indictment is insufficient in not directly charging that the defendants conspired to do such acts as constitute a crime under the section referred to; that the allegation that the defendants conspired to aid the landing of Chinese laborers by furnishing them false evidence, etc., is not a charge that they conspired to furnish such evidence. As to this my conclusion is that the allegation of an agreement to do an act by the employment of certain means sufficiently alleges an agreement not only to do such act but to employ such means,— that an agreement to aid an unlawful landing, or, what is the same thing, to commit the offense of so doing, by furnishing false evidence, is necessarily an agreement to furnish such evidence. It is also contended that the facts thus alleged do not constitute the crime of aiding and abetting the landing of Chinese persons not lawfully entitled to land under the statute, since it does not appear that the object of the conspiracy was to aid the landing of such Chinese laborers as came from a foreign port or place, and as were, therefore, not entitled to land.

The case most relied on, among a large number cited in support of these positions, is that of Pettibone v. U. S., 148 U. S. 197, 13 Sup. Ct. 542. That case grew out of an injunction issued out of the circuit court of the United States for the district of Idaho, enjoining the Miners' Union of Wardner and others from intimidating any employé of the Bunker Hill & Sullivan Mining & Concentrating Company. The indictment alleged that the defendants conspired "to commit an offense against the United States as follows, to wit: Said defendants did," etc., "conspire, combine and agree together to intimidate by force and threats of violence the employés of said Bunker Hill and Sullivan Mining and Concentrating Company," etc. It did not allege that the conspiracy was for the purpose of violating the injunction, or of impeding the administration of justice in the United States circuit court, or that the defendants, in committing the acts charged, knew that there was an injunction forbidding such acts. It alleged that the conspiracy was to do certain acts, and that such acts were prohibited by the injunction. The court held that an agreement to do the things enjoined was not a combination to violate the injunction, unless it appeared that the parties to the conspiracy knew of the injunction; that there must be a purpose to violate the injunction, and such purpose would not be imputed to the defendants from the mere fact that the acts which they were alleged to have conspired to commit were wrongful or unlawful. The court, in its opinion, says:

"This indictment does not in terms aver that it was the purpose of the conspiracy to violate the injunction referred to, or obstruct the due administration of justice in the circuit court, but it states as a legal conclusion from the previous allegations that the defendants conspired so to obstruct and impede. It had previously averred that the defendants conspired by intimidation to compel the officers of the mining company to discharge their employés and the employés to leave the service of the company, a conspiracy which was not an offense against the United States, though it was against the state. Rev. St. Idaho, § 6543. The injunction was also set out, and it was alleged that the defendants did intimidate and compel the employés to abandon work; but the indictment nowhere made the direct charge that the purpose of the conspiracy was to violate the injunction, or to interfere with proceedings in the circuit court."

In this case the indictment charges in terms that the conspiracy had for its object the crime of aiding and abetting the landing of Chinese laborers not lawfully entitled to enter the United States. The crime is charged in the language of the statute, with the additional averments that the Chinese persons to be aided in landing were laborers seeking to land from the steamships Wilmington and Haytian Republic, which vessels were plying between British Columbia and this city. The fault that is found with this indictment is that it states a conclusion as to the right to land of the Chinese persons who were to be aided in so doing by the conspiracy. It is contended that the indictment should be so framed as to preclude all inference in favor of the right of such persons to land, and that to do this it was necessary to aver that they came from some foreign port or place.

Where the crime is one that had a common-law name, an indict-

ment charging the crime by such name, and leaving its definition to the common law, would allege only a conclusion. 1 Bish. Cr. Proc. § 610. Such an indictment does not advise the defendant of the particulars necessary to enable him to prepare his defense and to identify the crime so as to plead the judgment in bar of a second prosecution. But where the words of the statute fully, directly, and expressly, without any uncertainty or ambiguity, set forth all the elements necessary to constitute the offense intended to be punished, it is sufficient to set forth the offense in the words of the statute. U. S. v. Carll, 105 U. S. 611. In this case all the acts of the defendants constituting the offense charged are particularly described. Nothing that is relied upon, as to such acts, is stated as a matter of inference or presumption. The point relied upon is that the indictment states a conclusion as to the right of the Chinese persons, who were to be aided in landing by the conspiracy, to enter the United States; that it is not only necessary to set out all the facts constituting the crime which the conspiracy was formed to commit, but that each of such facts, as just stated, must be so pleaded as to preclude every possible inference favorable to the accused. This involves that highest degree of certainty which places the matter alleged beyond the most "subtle objection." No such certainty has ever been required in the statement of the object of a conspiracy. In indictments for conspiracy the offense which the defendants are accused of having conspired to commit need not be set out with the same degree of strictness that is required where the indictment is for the commission of the offense itself. All the decisions upon this point are to the effect that certainty to a common intent is all that is necessary. The allegation that the defendants conspired to aid and abet the landing in the United States, within this district, of Chinese laborers not lawfully entitled to enter the United States from the steamships Haytian Republic and Wilmington, both plying between British Columbia and this port, states enough to clearly apprise the defendants of the identical crime with which they are charged. All Chinese laborers are excluded by the acts of congress. It is at least doubtful whether the words, "not lawfully entitled to enter the United States," add anything to the indictment. The act makes it a crime to "bring into the United States by land," or to aid and abet the same, or to aid and abet the "landing in the United States from any vessel" of any Chinese person not lawfully entitled to enter the United States. The landing in the United States from a vessel of Chinese not entitled to land has the same consequence as the bringing of such persons into the United States by land. The words, "bring into the United States," and "land in the United States," cannot, in my opinion, be understood to refer to persons already within the United States, or to persons who arrive on a vessel from a port or place within the United States. If I am correct in this, it follows that the words "from any foreign port or place," in section 2 of the act, which makes it an offense for the master of any vessel to knowingly bring within the United States on such vessel, and land or attempt to land, any Chinese laborer from any foreign port or place are

redundant. It was held in Re Tong Wah Sick, 36 Fed. 440, that where Chinese subjects who left one American port for another upon a through passage upon an American vessel without any intention of landing in any foreign country, and who did not go ashore, although the vessel landed at a foreign port, there was no departure from the United States. There seems to be no good reason for a different conclusion where the vessel is not American. A passenger upon any vessel, from one American port for another, without any intention of leaving the United States, cannot, upon his arrival at the port of destination, be said to have departed from the United States, or to be "brought into the United States" or landed therein (when landed), within the meaning of the words "bring into" and "land in the United States," contained in sections 2 and 11 of the act in question.

The question to be decided, however, does not depend upon the correctness of this conclusion. The indictment alleges that the conspiracy was to aid and abet the landing in the United States and in the state of Oregon from the steamers Haytian Republic and Wilmington, plying between British Columbia and the port of Portland, Or., of Chinese laborers, not lawfully entitled to land in the United States. Leaving out of consideration the words "not lawfully entitled to enter the United States," the natural and obvious meaning of what is alleged is that the Chinese laborers referred to were laborers from British Columbia, seeking to land from the two steamers named, and it is by such meaning that the phrase, "certain to a common intent," is defined. This construction may be liable to technical objection, but the strictness that answers such objection is not, as has already been shown, required in the description of an offense where the indictment is for a conspiracy to commit such offense. It is the duty of the court in such case to adopt the natural and obvious meaning of the words used, rather than an argumentative one. Nor is the court required to disregard the allegation that the Chinese laborers to be aided in landing were not lawfully entitled to enter the United States. There is no objection to the statement of a conclusion of a fact where such conclusion can only proceed upon a single ground, as in this case. There is no uncertainty or danger of surprise in such case. There is but a single objection that applies to a Chinese laborer not lawfully entitled to land under section 11 of the act of 1884, and that is that he comes from a foreign port or place. As to this, the case is within the principle adopted in U. S. v. Simmonds, 96 U. S. 363, where it was held, on an indictment under section 3266 of the Revised Statutes, charging the defendant with causing or procuring some other person to use a still boiler for the purpose of distilling, "within the intent and meaning of the revenue laws of the United States," that it was not necessary to aver that the distillery referred to was of alcoholic spirits; that the allegation that the vessels were used for the purpose of distilling "within the intent and meaning of the revenue laws of the United States" was broad enough to advise the accused of the nature of the offense charged.

It is also contended in support of the motion for a new trial that the allegation in the indictment that the Chinese persons whose landing the alleged conspiracy was formed to aid are to the grand jury unknown, is contrary to the proof, and inexcusble, for the reason that the manifests of the steamers Wilmington and Haytian Republic were on file in the customhouse, and contained the names of all Chinese persons who came to this port on these steamers during the time covered by the conspiracy. It does not appear that the object of the conspiracy was to aid the landing of particular Chinese, but rather to aid all Chinese of a particular class,—to aid the landing of such Chinese laborers as should come here on the steamers Wilmington and Haytian Republic. The indictment goes further, and alleges that, in pursuance of the conspiracy, a large number of Chinese laborers whose names are to the grand jury unknown were unlawfully brought from British Columbia on such steamships, and landed at the port of Portland. The steamers' manifests do not identify these laborers. They fail to disclose that any Chinese laborers arrived at this port by such vessels. The Chinese passengers who arrived during this time in the steamers in question are described on the steamers' manifests as "merchants." There is nothing in the manifests to give information of the names of any laborers unlawfully landed, and upon this the defendants make the additional point that these manifests, having been introduced in evidence by the government, establish the fact that the Chinese passengers who arrived by the Wilmington and Haytian Republic during the period of the conspiracy were merchants, and entitled to land, and that the verdict, as to this, is contrary to the evidence.

, These manifests, so far as they relate to passengers, are the sworn statements of the master of the vessel of the passengers he carries, their sex, occupation, nationality, etc., necessarily derived from information furnished by the passengers themselves. These statements are not evidence in the trial of any issue depending upon such facts. Moreover, it is immaterial whether any Chinese laborers were in fact landed as a result of the alleged conspiracy. If the criminal agreement was entered into, and any of the overt acts alleged was committed, it is enough.

It is urged in behalf of the defendant Mulkey that there is no evidence tending to show that he was a party to, or had knowledge of, the alleged conspiracy; that the only testimony there is to involve Mulkey is that of Blum, to the effect that he hired Mulkey to aid and abet the landing of Chinese, and to assist in smuggling opium, and that there is nothing in this to imply knowledge on Mulkey's part that a conspiracy was in existence for such objects. The testimony of Blum is to the effect that Dunbar, Jackling, and himself entered into an arrangement to effect the landing of Chinese laborers from British Columbia arriving by the Wilmington and Haytian Republic by means of fraudulent certificates; that afterwards Dunbar introduced the defendant Bannon, who was brought into the office of the steamship company, and with whom the matter was talked over, and who was told what he was expected to do,

and requested to have 500 blank Chinese certificates, printed in three or four different forms; that Bannon agreed to make out the certificates for two dollars each, Blum and Dunbar to furnish the Chinese pictures therefor; that thereafter, and during October, 1892, on a Sunday morning, he, Blum, met the defendant Mulkey on board the Haytian Republic as she was lying at the Union Pacific dock in this city; that they came up town together in a carriage, and had a bottle of wine in a private box in the Reception saloon; that he said to Mulkey, "You have been bothering our Chinese and opium business a good deal, and I want to have a private talk with you," and was invited by Mulkey to meet him at his room in the Portland Hotel the next day at 2 o'clock. Blum continues his testimony as follows:

"I went up there the next day (Monday), and in the mean time I told Mr. Dunbar of this appointment. Mr. Jackling was there, too. We all talked it over, and it was suggested between us, by all of us, if we could make any deal with Mulkey, to bring him into this combination, we could afford to pay him to do it. When I met Mulkey I discussed this subject with him, and told him he was giving us a good deal of—a little—annoyance, and up to the present time there had been nothing but glory in it for him."

Blum testifies that in this conversation Mulkey told him that he (Mulkey) knew that we (the Merchants' Steamship Company) were bringing in a great deal of opium, and a great many Chinese laborers who had no right to land, and threatened to get them all in the penitentiary. Blum testified as to what followed this threat:

"And I said, 'I want to know how much money it would take to have him interested in our business matters.' After a good deal of talk, he agreed not to interfere with our Chinamen or Chinese laborers or our opium matters, and let us bring just as many as we pleased, in consideration of $1,200, to be paid him monthly in advance, the first payment to be made right then and there."

This, Blum says, was agreed to with the further agreement that Inspector Dillon should bother "us [them] no more, and, if Dillon got any information, Mulkey would communicate it to the company in time to enable them to let the Chinamen and opium get off." Blum further testified that this monthly payment of $1,200 was paid during the continuance of the conspiracy. A number of letters, signed "John," addressed to John Quinlan, were received in evidence. Blum testified that these letters were in pursuance of an arrangement between himself and Mulkey, who was to address Blum under this name. The testimony of other witnesses (although the testimony was conflicting as to this) identified the writing as that of the defendant Mulkey. There was inherent conspiracy in these letters. One of them is as follows:

"It looks as though some local growlers were come into your city, to make trouble for your jay birds. I am not sure of this, but strongly suspect it. Under a lately-published pamphlet on the alighting of jay birds, if they are not laborers or working birds, and have been here before, they may alight. Have Jim quietly work along and land these he safely can, and let balance go to court. There has been a good deal of loose talk about John's going there so much, so he thinks he had not better go over there now. In case of a subsequent kick from the great mogul, he can and will save them. Do not make any deal with them; they will not do to trust. It took fine work,

and a liberal use of grease, to prevent a grand explosion in your vicinity last night and this morning."

According to Blum's testimony, "John" was Mulkey himself; the "great mogul" was the secretary of the treasury, whom the conspirators feared; "Jim" was the defendant James Lotan, collector of customs at this port, who is also referred to in other of the letters as "papa;" the "local growlers" who were making trouble, and who were not to be dealt with, because they could not be trusted, were treasury agents. In another of these letters reference is made to "that Jackling matter," and this is explained by Blum to refer to a complaint by Jackling that Inspector Dillon, whom Mulkey had agreed should be "pulled off" at Vancouver, was hounding Jackling all around the docks, and that Jackling was becoming nervous in consequence. The same letter also refers to "the 1,200" being paid Mulkey, with the statement, among others, that "our little side show will help you to recoup. If you don't understand this, I will explain when I see you." This reference to Jackling and to the little "side show" between the writer and Blum, which was to help the latter to recoup, tends to show agreement and co-operation with the Blum, Jackling, and Dunbar combination, and to render inadmissible the explanation that whatever of criminal relation the facts tend to establish between Mulkey and Blum was apart from such combination. The reference to a "side show" indicates that they were acting conjointly with others, and were at the same time engaged in transactions to which such others were not admitted.

The fact of the original criminal agreement between Blum, Dunbar, and Jackling is testified to by Blum and Jackling. The assent of the other defendants may be established as an inference by the jury from the other facts proved. Any joint action upon a material point or a collection of independent but co-operating acts, by persons closely associated with each other, is sufficient to enable the jury to infer concurrence of sentiment. Archer v. State, 106 Ind. 426, 7 N. E. 225. Without the proof of the original agreement, it was competent to prove the acts of the different defendants, and thus prove the conspiracy between them. Spies v. People, 122 Ill. 1, 12 N. E. 865, and 17 N. E. 898. The evidence of joint action between the defendants covers a great many transactions, and extends over several months of time. It is not only sufficient to authorize an inference of guilt, but it is of a character, if believed, to make any other inference impossible. The evidence of knowledge and participation in the combination on the part of the defendant Mulkey does not, however, depend upon a collection of independent and co-operating acts, although the evidence of such acts is sufficient for such purpose. The formal agreement with Mulkey testified to by Blum directly tends to connect the former with the terms of the original combination. Blum testifies that after he had arranged for his meeting with Mulkey at the Portland it was agreed between himself, Dunbar, and Jackling that they would, if possible, make a "deal" with

Mulkey to bring him into this combination, and that when he met Mulkey by such appointment he "discussed this subject with him;" that he asked Mulkey "how much it would take to interest him in our business matters," and that the price was fixed at $1,200 per month.

It is argued that the evidence is insufficient to sustain the verdict. I am of the opinion that such evidence is not only sufficient to sustain the verdict, but that the correctness of the conclusion reached by the jury does not admit of a reasonable doubt.

The point is also urged that Blum's plea of guilty is a conviction of crime that renders him incompetent to testify. The rule is well settled that there must be a judgment of conviction pronounced by the court to have that effect. Rap. Wit. § 16; Blaufus v. People, 69 N. Y. 108. And, besides this, it is a matter of doubt whether the charge to which the witness pleaded guilty is punishable by imprisonment in the penitentiary. The punishment provided is fine and imprisonment without hard labor. Section 5539 of the Revised Statutes provides that whenever any criminal convicted of any offense against the United States is imprisoned in the jail or penitentiary of a state, such criminal shall in all respects be subject to the same discipline and treatment as convicts sentenced by the courts of the state or territory in which such jail or penitentiary is situated, and, while so confined therein, shall be exclusively under the control of the officers having charge of the same under the laws of such state or territory. Prior to this act, on March 3, 1825, congress had provided that, in every case where criminals convicted of any offense against the United States shall be sentenced to imprisonment to hard labor, it shall be lawful for the court passing the sentence to order the same executed in any state prison within the district where the court is holden, the use of which has been granted by the state for that purpose. The act of the legislature of this state passed October 29, 1870, authorizing the keeper of the state penitentiary to receive United States prisoners, recites this last act of congress, and appears to have been passed in contemplation of that act, and therefore to have had in view only persons who are sentenced to imprisonment at hard labor. All state convicts in this state are subject to hard labor, and may be bound by contracts for labor to private persons. This presents the question whether a person convicted of an offense that does not provide for a judgment requiring hard labor can be imprisoned in a penitentiary where such labor is required under the laws and regulations governing the same, and where the act of the state for the keeping of such prisoners appears to have been passed with reference to United States prisoners under sentence of imprisonment at hard labor.

The motions are denied.