COURT OF APPEALS,

Nov. 15, 1910.

# THE PEOPLE v. DOMINICO FERRARA.

(199 N. Y. 414.)

(1.) MURDER—QUESTIONS OF FACT FOR JURY.

It is for the jury, and not for the court, to determine contro-verted questions of fact arising upon conflicting evidence, and where a jury upon such evidence has reached the conclusion that a defendant is guilty of a crime and such conclusion has been reached by the determination of which of two sets of witnesses the jurors will believe, their verdict should not be set aside unless the evidence is such as to indicate some misunderstanding by them of the questions involved or of the importance or bearing of particular facts or that the jury was affected by some bias or prejudice against the defendant.

(2.) SAME—EVIDENCE.

On examination of the evidence on conviction of defendant for the crime of murder in the first degree, *held*, that there is no such apparent misunderstanding by the jury of any question of law or fact or any bias or prejudice against the defendant as to justify the court in setting aside the verdict as against evidence.

(3.) SAME.

At the jail three days after the murder, defendant, in the presence of witnesses, was confronted with the man who was jointly indicted with him but tried separately, who, looking at defendant, said: "That's the man that done the cutting." De-fendant made no reply except to shrug his shoulders. The value or effect of this evidence was for the jury, but in view of the facts and circumstances surrounding the incident its admission was not error.

(4.) SAME—ACTS AND STATEMENTS OF CO-CONSPIRATORS.

The fact that the defendant was separately tried in no way changes the rule that the acts and statements of co-conspirators are

admissible against each other. Evidence, to the effect that the person jointly indicted with defendant sent an employee to notify a third person that he was ready to pay his rent and that such third person said he would send a man for it in the afternoon, was not improper in view of testimony that the persons jointly indicted had planned together to commit the crime.

(5.) SAME—NEWLY DISCOVERED EVIDENCE—MOTION PROPERLY DENIED IF IT COULD HAVE BEEN KNOWN BY DEFENDANT'S COUNSEL IF REASONABLE DILIGENCE HAD BEEN EXERCISED.

Upon a motion for a new trial, upon the grounds of newly-discovered evidence, defendant's counsel asserted that evidence consisting of the testimony of a policeman, as to statements made to him by deceased shortly after the homicide, and of the record of statements made by the deceased when he was admitted to the hospital, was unknown to him until it was brought out by the prosecution on the subsequent trial of the defendant's accomplice. The fair construction of this evidence is that deceased did not know who hit him, but that the only person that he saw in the room was the other defendant. It appears that statements similar to those so testified to were published in the newspapers and were matters of common knowledge at the time, and that the statements made by the deceased to the hospital physician became a part of the public records of the hospital. *Held*, that the evidence, assuming it to be proper, could have been known to the counsel for defendant if reasonable diligence had been exercised before the trial, and that the motion for a new trial was properly denied.

APPEAL from a judgment of the Supreme Court, rendered January 11, 1910, at an Extraordinary Trial Term for the county of Albany upon a verdict convicting the defendant of the crime of murder in the first degree.

The facts, so far as material, are stated in the opinion.

*Peter A. Delaney* and *Michael D. Reilly* for appellant. Reversible error was committed in the admission of the testimony of the People's witnesses in reference to the action and statement of Vincenzo Leonardo at the Albany county jail. (*People v. Koerner,* 154 N. Y. 355; *People v. Kennedy,* 164 N. Y.

449; *People* v. *Smith,* 172 N. Y. 210; *People* v. *Cascone,* 185 N. Y. 317.) Appellant's motion for a new trial upon the ground of newly-discovered evidence should have been granted, and for error denying the same the judgment appealed from should be reversed. (*Hurd* v. *People,* 25 Mich. 415; *Wellar* v. *People,* 30 Mich. 22; *Donaldson* v. *Comm.,* 95 Penn. St. 21; *State* v. *Metcalf,* 17 Mont. 417.)

*Rollin B. Sanford, District Attorney,* and *Harold D. Alexander* for respondent.

CHASE, J. On Saturday, October 2, 1909, George E. Phelps received six wounds in his head and neck, from the effects of which he died October 6, 1909. The wounds were not self-inflicted, nor were they the result of an accident. His death was the result of a homicidal act. It appears without contradiction or dispute that the person or persons who inflicted the wounds deliberately designed to effect his death.

Vincenzo Leonardo and this defendant, Dominico Ferrara, were jointly indicted for the crime and charged with murder in the first degree. Both pleaded not guilty, and each demanded a separate trial. The jury found the defendant guilty, and it is from the judgment of conviction that this appeal is taken.

The homicide occurred in a building at the southwest corner of Broadway and Madison avenue in the city of Albany. Vincenzo Leonardo Senior, father of the one jointly indicted with the defendant, was the tenant of the building, and the floors above the first floor were used for cheap lodgings. The first floor was occupied in part as a saloon. The barroom was in the northeast corner of the building, and to it there was an entrance from Broadway and also from Madison avenue. Adjoining the barroom on the west was a sitting room, and to such room there was an entrance from the barroom and also through a

small room used as a kitchen, adjoining the sitting room from Madison avenue. Immediately south of the barroom and the sitting room was a hall, to which was an entrance from Broadway. At the left of the entrance was an office partially partitioned from the remaining part of the hall. Back of the office was an entrance from the hall to the barroom, and opposite the entrance to the barroom, and south of it, was an entrance to a room which is south of the hall, and which is called a storeroom. In the hall, immediately west of the doors leading therefrom to the barroom and storeroom respectively, was a stairway on the south side of the hall leading to the second floor and the lodgings, and a narrow hall leading past the stairway to another stairway, and a rear entrance, which was reached by an alley leading from a street west of the building, which street is parallel with Broadway. The storeroom had formerly been used as a pool-room, but at the time of the homicide it was partially filled with furniture, boxes, rolls of carpet and other things, and among the other things there was at the right of the entrance from the hall a wagon, and in the northwest corner of the room, and west of the wagon, was a pile of coal. Immediately to the left of the door as one entered from the hall, and behind such door as it was opened, was a desk about two feet wide and three feet long. Leading from a doorway at the west end of the storeroom and near the south side of it was another hall, from which was a door to the alley mentioned, and further to the west and opening from such hall was a rear room, extending west beyond the other part of the building and to the street referred to as paralleling Broadway. From the storeroom double doors lead into Broadway, but at the time of the homicide one of the doors was closed and fastened and the other could not be opened from the outside, because the knob with which to turn the bolt fastening it had been broken off. It could be opened from the inside.

A short time before the homicide Leonardo, Junior (here-

inafter referred to as Leonardo), obtained a saloon license for the rooms so used as a saloon. The defendant resided with his brother at the corner of Broadway and Herkimer streets in said city. The place where he resided is two short blocks south of the Leonardo building. The brothers occupied a three-story building also used as a cheap lodging house, except that a portion of the first floor was occupied by them as a fruit store and another portion thereof as a kitchen and living room. The rent of the Leonardo building was payable on the first of each month. It was not paid on Friday, October 1. The price of lodgings in the Ferrara building was ten cents. The defendant's brother divided the amount received with the defendant from time to time. The brother testified that if the defendant had any money it was very little.

On Saturday morning Leonardo told his bartender to tell a man whom they saw on Broadway to send some one to collect his rent. He told the man as directed. The man replied that he would send some one in the afternoon. This was communicated to Leonardo. Phelps went to Leonardo's saloon to collect the rent before 2.30 P. M. Saturday, October 2. A few minutes thereafter, and, as nearly as can be told, at 2.30 P. M., he was seen to come from said storeroom, through the hall and barroom, and pass into the street. He was covered with blood, and blood was streaming from one of his temples. Soon thereafter he was taken to the hospital, where he died a few days later. The autopsy disclosed the wounds mentioned, which the surgeon described as " stab " and " knife " wounds. Two of the wounds were more severe than the others, one of which was back of the right shoulder, extending to and against the spinal column; the other was in the right temple and it was about one inch, or an inch and a quarter in length and penetrated the skull and also penetrated and lacerated the brain. There was a black and blue spot covering the left eye and the region about the eye, and to a lesser extent the right lower eyelid.

The theory of the prosecution is, that Leonardo and the defendant were in need of money, and that at some time prior to the commission of the crime they planned to take the life of some American in the locality where they lived, for the purpose of obtaining money, and subsequently, with that end in view, word was sent by Leonardo to the landlord of the premises occupied by him and his father to send some one there for his rent; that when it was known that he would be there Saturday afternoon, the defendant in some way was made aware of the arrangement; that Phelps was sent for the rent and was taken into the unused storeroom where Leonardo and the defendant (who must have preceded Phelps into the room and temporarily concealed himself therein) made the assault upon him that resulted in his death.

The defense consists of an unqualified denial. No one was produced on the trial who testified to seeing the assault. The only direct evidence connecting the defendant with the assault was given by one Bernabic, a detective, to whom, he testifies, the defendant disclosed to some extent his connection with the crime.

Bernabic is an Austrian who speaks several languages, including Italian, which he speaks indifferently. He has been in this country fourteen years, and is an American citizen. For six years prior to the trial he had been employed by a private detective corporation, and actually engaged during most of that time in behalf of the New York Central & Hudson River Railroad Company. He testified that on December 2, while working for said corporation in behalf of the city of New York, he was ordered by the president of the corporation to go at once to Albany; that he did so that night, and arrived in Albany in the morning and went to the office of the New York Central police department; that he there saw the president of the detective corporation and talked with him, and was told what he was there for. He testified among other things that he was

hired to go to jail and get evidence in this case against Do-
minico Ferrara; that he was not told the name of Phelps or of
any other person at all, and that he was not told that a man had
been stabbed or killed in Broadway, but that he was told that
two Italians were locked up for murder. Soon thereafter he
was taken by an officer as a common prisoner and subsequently
locked in the county jail, where he remained for nineteen
days. He became acquainted with the defendant and was asked
by him what he was in jail for, and he told him that he came
down from Troy that morning and while he was getting some-
thing to eat he was arrested and searched, and that the officer
found a revolver on him. He testified that the defendant and
other prisoners said that he must be held on suspicion of a
Green Island murder. He testified that they talked every day,
but nothing was said about this case for four or five days. He
testified that the defendant said in substance that Leonardo got
a pick from his brother-in-law about a month before the crime
and dug a hole where the man murdered was supposed to be
put; that subsequently and on the same day Leonardo's lawyer
came to talk with him and Leonardo was taken outside of the
hall at the jail and defendant said to him (Bernabic), "Look
over here, Mike; here is Leonardo and he swear he say this is
the man. He is a 'squealer' he says," and he say, "If I ever
get out of this trouble any time I won't have nothing to do
with these Sicilians any more." I say, "Why?" "Well," he
say, "the Sicilians are no good; they are squealers; if they do
anything wrong like this and if there is anybody else with
him in company they squeal on everybody," and he says, "A
Calabrian is not that way; if they do any thing like that, one
man what get caught," he says, "he puts the whole blame on
himself and he won't tell on the rest of the bunch at all."

That on another day the defendant talked with him about
his (witness) case, and the defendant asked him if he belonged
to any organization in New York that would help him and

said that he belonged to an organization; that they used the name of " Famel Murtabano; " that it was what the people outside called " black hand," and the witness told the defendant that he belonged to an organization in New York and that he " belonged to a bad bunch of fellers, too," and the conversation was continued as to the manner of initiation into the societies and how they could recognize one another, the details of which are unimportant at this time. The witness testified that he wrote a letter from the defendant to a brother in Rochester and the defendant put on other sheets of paper certain letters or writings which he said could be given to the leader of his organization. The witness produced the papers, but they have not been translated and are of no ascertainable meaning. Later the witness testified that the defendant told him more in detail about the crime for which he is indicted. Among other things the witness testified: " He say that two months ahead when this crime was committed that Vincenzo Leonardo told to Dominic Ferrara that they were going to kill some American who got a lot of money, but Dominic say at that time, ' I don't know who was this American,' and two days before the crime was committed he say, ' I meet Leonardo in the doorway of his saloon, which was on the corner of Broadway, and Leonardo told me that next day we are going to do this job, and he showed me his knife which he was carrying with him all the time. He say this knife was what he call a poniard.' I ask Dominic, ' What do you mean by that, poniard ? I never see such a knife before; I don't know what kind of looking knife is it.' He says, ' It is a knife with a point sharp both sides.' Then I say, ' The knife must be dangerous to carry like you say that Leonardo was carrying that knife with him all the time.' ' Well,' he says, ' this kind of knife they have some kind of cover to put the blade inside—some kind of box or something or leather, made of leather. It is not dangerous at all; he always carry it under his shirt in here (indicating). When he

done this,' he says, ' it was on Saturday around two o'clock in the afternoon.' He says, ' when this man came in there in the saloon to collect his rent Leonardo told to him, ' Go in the next room outside of the bar.' So he did. He say, ' He went up there and sat down at the table so Leonardo,' he says, ' come up there and he started in to count his money.' He says, ' He have about $120 in a handkerchief, and I stood over behind, he says, and hit this man with the old Leonardo's stick?' Then I ask Dominic I say, ' What do you mean by that, old Leonardo's stick?' ' Well,' he says, ' Leonardo's father is an old man; he is a lame feller; he can't walk without a stick, so this was one of his sticks what he used when he go out,' and he says, ' I struck this man over his head and the stick got broke, and this man started in to fight with us, and I got scared then,' he say, ' and I ran away, and this time Leonardo pulled out his knife and he stabbed this man and I left him over there and run away.' "

The witness further testified that defendant told him that after the homicide he went with his brother to pay their rent and then came back and saw Leonardo taken away by the officers, and he further testified: " I never was afraid of anything because Leonardo supposed to be not a squealer and I wasn't afraid anyway because," he says, " I never had no blood on me only where I have blood on my right hand and the handkerchief, and Leonardo's clothes what he have on," he says, " was all covered with blood." He says, " I stood three days after this crime was committed in Albany; if I should know he was going to squeal on me I have plenty of time to go away," but he says, " I was always thinking that he won't squeal, the same as he is not supposed to squeal. He is supposed to die and get whatever they give to him but not squeal. It was three day," he says, " after this crime was committed, when they locked me up. But," he says, " I am more afraid of some woman," of which he never mentioned any name to me, that

she might do more harm to him in this case than anybody else. He says, " I am not afraid much of Leonardo, because," he says, " I think that Leonardo's testimony against me won't be any good at all."

The derby hat which Phelps wore when he went to the saloon was found after the homicide a few feet back of the small table, with an indentation in it such as may have been made by a blow from a walking stick, and in the room that we have called the rear room it was found that the floor had been taken up and a hole about two feet wide, five or six feet long and four feet deep had been dug, and it remained open. The dirt had been piled upon the floor adjoining the hole. The defendant after the homicide on Saturday did go with his brother to their landlord, and subsequently they went up Broadway to a point near Madison avenue.

One of the women at that time living in the Ferrara house testified that on Saturday the defendant went out of the house about eleven o'clock and returned about one o'clock. She says that he changed his clothes at that time from a gray suit that he was wearing to a brown suit, and afterwards went up Broadway towards Madison avenue. We quote from her further testimony: " He went up and he dilly-dallied around the corner; he went up to Broadway and Madison avenue and dodged back and forth behind a tree and after that he had a talk with the boys and went into the saloon on the corner of Madison Avenue and Broadway." She testified that she next saw him at half-past two as near as she can remember near Herkimer street and that he came in the house and walked over to the sink and turned on the water; that he had a knife, the blade of which was about six inches long and the handle about four inches long; a jack knife that folded; that she noticed that there was blood on it. She further testified, " I asked him what made him so nervous, and he said it was all right, kid. And then he walked over to the door and I said,

'There is a spot of blood on your shirt.' And he said, 'Never mind, kid. It is all right.' I saw a spot of blood on the back of his shirt, right between his two shoulders. He didn't have a coat on at that time. I asked him what was the blood on his shirt for and he said it would be all right; 'never mind, kid,' it would be all right. I saw blood on his face, on the cheek (ind.). After he washed the knife he threw it up on the shelf in the kitchen." She further testified " he washed his face and hands and he washed his face in a handkerchief and he threw it in a box under the counter * * * it was a red handkerchief with red border and red stripes." She further testified that he walked up and down the floor and used a blasphemous exclamation; that he went upstairs and changed his clothes to the gray suit again, and then came down and went up Broadway where the crowd was that had congregated after the homicide. She further testified that on the following Monday she went with the defendant to a laundry where he took the shirt on which were the blood spots to have it laundered.

Another woman who lived at the Ferrara house testified that the defendant went out Saturday morning and returned and afterwards went out again. She says that she was standing in the doorway at the Ferrara house and that the defendant came down the street just as the crowd began to gather at the corner and passed her like a shot out of a gun and went into the house, and she testified to his using the blasphemous expression and that he seemed nervous and excited. She says she did not notice any blood and did not see anything in his hand, but that she was not paying any attention.

The defendant was arrested three days after the murder and taken to the police station, where he was told that Leonardo charged him with stabbing Phelps and he denied it. After he was taken to the jail and in the presence of witnesses, including two officers, he was confronted with Leonardo and Leonardo, looking at him, said: " That's the man

that done the cutting." The defendant made no reply except to shrug his shoulders.

The agent for the owner of the Leonardo building testified that Phelps was in his office about two o'clock Saturday but that he did not know what time he left. He also testified that on Thursday or Friday after the homicide he found a handkerchief in a macaroni box on a shelf on the north side of the Ferrara store. The women who testified to seeing the defendant wash his face with a handkerchief identified the handkerchief found as the one which the defendant then used, and it bears evidence of blood stains.

A young man at the time of- the homicide in the employ of Ferrara testified that the defendant showed him a knife made out of a file when he was in the kitchen a few days previous to said Saturday; that on October 6 he was with the officers when a search was made for the knife, but they did not find it. He also testified that Leonardo opened his saloon Friday night before the homicide; that he was passing the saloon that night with the defendant, and at his suggestion they went in; that Leonardo said to defendant, "Hello, Dominic," and gave each of them a drink, and that Leonardo and defendant had a talk by themselves for a few minutes; that on Saturday morning he sat in the park nearly opposite defendant's store with the defendant, and that defendant left him at probably eleven o'clock and went up Broadway. On October 8 an officer again searched the Ferrara house and found a knife made out of a file in defendant's brother's room on a mantel, behind a picture and under a paper. It is not a folding knife. Soon after the homicide officers searched the Leonardo building. In the storeroom they found the floor back of the desk covered with blood; on the floor they also found the hat with a pair of eye glasses in it; some small coins amounting to sixty-three cents and the broken crystal of a watch. In the northwest corner of the room, on a coal pile beyond the wagon they

found a watch with blood on it — to it was attached a broken chain, and the crystal of the watch was missing. The widow of Phelps identified the watch as one that he wore. One witness testified that between two and three o'clock he went upstairs in the Leonardo house to a sitting room in the northeast corner of the second floor, and in doing so he passed through the barroom and saw Leonardo, his bartender and another man there; that about twelve or fifteen minutes after he heard wrestling and scuffling, and a man called " Murder," and a minute or two after he saw the man bleeding in the street.

Leonardo's bartender testified that he never saw any business done in the storeroom; that he saw the defendant in the saloon Friday night and that the defendant talked with Leonardo probably twenty minutes; that he, at Leonardo's request, notified the man that he could send some one for the rent; that he left the saloon on Saturday about two o'clock and did not return until about twenty minutes of four.

A man that was passing the saloon saw two men struggling out of the door to the street. One was Phelps and he was covered with blood and the other one was Leonardo and he went back.

A car inspector who was riding on a north-bound street car came along about thirty-two minutes after two and went to Phelps' assistance; at that time no one was with Phelps. He testified as follows: " I raised him up and saw the wound. I asked him what happened to him. He said, ' I have been stabbed.' I asked him, ' Where ? ' He turned — he was facing north, he turned and pointed to the corner on the southwest corner. He said, ' In there.' He again repeated, ' Get my hat.' I said, ' Never mind your hat. Come over and sit down.' The blood was coming freely. I endeavored to stop the flow of blood and get him seated. He almost refused to leave the center of the street until I would get him his hat. Finally I had to force him to that side of the street and as

we were getting to the curb he took hold of his coat and he pulled it open and as he pulled it open he put his hand into his pocket (ind.) and he said, ' The receipts, the receipts, the receipts are gone.' ".

The witness says he went over to the saloon and found it locked and returned to Phelps; that an officer was questioning him and he heard him say, " The money is on the table."

The defendant was sworn as a witness and testified that he had known Leonardo for five months. He further testified that he was at the Ferrara building from one o'clock on Saturday until after the homicide, and in this he was corroborated by his brother. He denied most emphatically that he had admitted to the detective that he had any participation in the crime, and he also denied the testimony of the women sworn in behalf of the prosecution so far as such testimony tended to connect him with the homicide.

Except as stated there is very little conflict in the evidence although counsel for the defendant insists that the testimony of the prosecution is contradictory and unreasonable. He also calls attention to the fact that the alleged broken stick was not found and the defendant testified that the handkerchief found in the box was used on Monday following the homicide to quench the flowing blood which was then upon the face of a person in the house.

The defendant also produced a witness who testified that he went to Leonardo's for a pail of beer Saturday afternoon; that he went into the barroom, but that when he went in there he saw no one there; that he saw Phelps come out of the hall into the barroom and pass into the street; that he saw Leonardo in the storeroom and his father was behind him; that when he first saw Leonardo he had hold of Phelps and that he was frightened and ran out and across the street.

Another witness for the defendant testified that he worked for Leonardo; that he was in the barroom Saturday after-

noon when Phelp came in, and that Leonardo then sent him away on an errand; that he was gone twenty or twenty-five minutes and returned about half-past two, but found no one in the barroom; that Leonardo, Sr., was in the sitting room and he went in there and talked to him but he made no reply; that he then started to go upstairs and met Leonardo standing in the doorway leading to the storeroom; that he said to Leonardo, " what was the matter " and he replied, " nothing; " and that he then returned to the sitting room. He further testified as follows: " I wasn't there half a minute when I heard somebody hollering; I heard them hollering ' Oh ' as if he was hurt. He didn't holler very loud. He just hollered, ' Oh,' ' Oh ' just as if he were getting hurt or something. The old man jumped up and he said, ' Fight; ' and he went out in the barroom and I followed him.  *  *  *  The first thing I saw after we got into the barroom was this Phelps stagger out with blood all over him. He came from across the hall out of that poolroom. The door between the hall and the barroom was open when he came out. There wasn't nobody with him only when Phelps staggered in the hallway the old man went past him and went in the poolroom. Vincent Leonardo, Junior, was right back of Phelps. Vince had hold of Phelps in the back, with one hand holding the bottom of the coat, and the other hand about midway up the back.  *  *  * Phelps dragged Leonardo clear over to the Broadway door. Leonardo seen that he was getting away from him and he let loose of him, and Mr. Phelps went outside. * * * When Leonardo, Sr., came out of the poolroom he went upstairs. I noted that he had the money in his hand as he went upstairs. I seen a couple of bills across his hand like that (ind.), and then something tied up in a rag. At that time young Vincent Leonardo was in the back part washing the blood off his hands and face." Leonardo, Senior, was not sworn.

At the close of the evidence on behalf of the prosecution

counsel for the defendant said: "I now make a formal motion * * * to advise the jury to acquit on the ground that there is not sufficient evidence to warrant the submission of the case to the jury on the part of the prosecution." The motion was denied and an exception was taken. The denial of the motion was undoubtedly right, as the evidence was such as to require the submission of the case to the jury. At the close of all the evidence no further motion to discharge the defendant was made. There was an apparent acquiescence in the course pursued by the court in leaving the question of fact to be determined by the jury. At the close of the court's charge to the jury the district attorney and the counsel for the defendant each stated that he had no requests to make to the court in regard to the charge, and no exceptions were taken. At the close of the evidence, a brief statement of the material parts of which we have mentioned, it was the duty of the court to submit the question of the defendant's guilt to the jury for their determination, and were it not for the rule in criminal cases (Code of Criminal Procedure, sec. 389) requiring greater certainty of proof than is required in civil cases, it probably would not be contended that the court committed an error in denying the defendant's motion for a new trial upon the ground that the verdict was clearly against the evidence.

Section 181 of the Penal Code provides: "No person can be convicted of murder or manslaughter unless the death of the person alleged to have been killed and the fact of the killing by the defendant, as alleged, are each established as independent facts; the former by direct proof and the latter beyond a reasonable doubt."

Where a jury upon conflicting evidence has reached the conclusion that a defendant is guilty and such conclusion has been reached upon the determination of which of two sets of witnesses they will believe their verdict should not be set aside unless the evidence is such as to indicate some misunderstand-

ing by the jury of the questions involved or of the importance or bearing of particular facts or that the jury were affected by some bias or prejudice against the defendant.

It is urged that all the circumstances are improbable and that the verdict shocks one's sense of justice. It is true that the fact that a crime was committed when considered in connection with the public place in which it occurred — the time of day — the bungling manner in which it was done, and the smallness of the amount of money which the perpetrator or perpetrators could have hoped to get from the victim is almost unbelievable, but that the crime was committed is conclusively established and by every one conceded. The three important witnesses for the prosecution together with the defendant and all the other witnesses were present before the jury when their testimony was given and such testimony was discussed before them at length by competent counsel, alert to show to them every inconsistency and contradiction therein. If the testimony of the three most important witnesses for the prosecution is true, the defendant is guilty beyond a reasonable doubt.

It is for the jury, and not for the court, to determine controverted questions of fact arising upon conflicting evidence. (*People* v. *Place,* 157 N. Y. 584; *People* v. *Cascone,* 185 N. Y. 317; 20 N. Y. Crim. 175.)

The jury has found the defendant guilty beyond a reasonable doubt and there is no such apparent misunderstanding by them of any question of law or fact or of any bias or prejudice against the defendant that requires or would justify the court in setting aside the verdict as clearly against evidence.

There are but few questions of law involved in this appeal. The defendant's counsel objected to the testimony that was given of what was said and done when the defendant was confronted with Leonardo at the jail. The defendant had previously been told that Leonardo charged him with having stabbed Phelps and he had then denied it. It does not appear

that he had ever been charged by Leonardo personally with having done the stabbing until the occasion at the jail. When Leonardo made the statement " That's the man that done the cutting," he was but a few feet from the defendant and facing him. His shrug of the shoulders may have been his way of expressing that a reply would be useless, or that he was indifferent. It would seem to indicate some knowledge of what .was said or being done. The extent to which the defendant understood English had been shown and he was in no way prevented from replying if he desired to do so. The value or effect of this evidence was for the jury, but in view of all the facts and circumstances surrounding the incident it was not error for the court to allow it to be received as evidence by the prosecution.

The testimony about an assault upon the defendant's brother, about which the defendant complains, was at the close of the evidence stricken from the record on motion of the defendant's counsel and by the consent of the district attorney.

The evidence to the effect that Leonardo told his bartender to notify a person then on Broadway that he was ready to pay his rent and that such person said he would send a man for it in the afternoon was not improper in view of the testimony of the detective that Leonardo and the defendant had planned together to commit the crime. The fact that the defendant was separately tried in no way changes the rule that the acts and statements of a co-conspirator are admissible against each. (*People* v. *McKane*, 80 Hun, 322.)

Soon after the judgment in this case Leonardo was tried upon the same indictment, and upon his trial the People produced Officer Church who had not been sworn upon this trial. Church testified in substance that he talked with Phelps before he was taken away in the ambulance; that Phelps said, " The only man in the room was the young man that run the place;" that he also said, " I asked him if he stabbed him

and he said it must have been him, he was the only one in the room." It was also shown on the Leonardo trial that Phelps when he entered the hospital was asked certain questions to enable them to fill out the hospital record, and that Phelps made statements that were entered upon such records as follows: "Patient was counting money in 228 Broadway in a room off the bar; was hit in the head; does not know who hit him; says only one man who was in the room was the young man who runs the place; young man smooth face; thinks he has no mustache. He (Phelps) pulled a knife out of his neck and dropped it, when next he remembers the young fellow had him by the coat and was trying to drag him by the coat; he says he got out of the place then."

Counsel for the defendant asserts that the testimony by Church and the record at the hospital were entirely unknown to him at the time of the defendant's trial. He made a motion for a new trial upon the ground that the testimony mentioned constituted newly-discovered evidence which required that a new trial should be had. The fair construction of such evidence is that Phelps did not know who hit him, but that the only person that he saw in the room was Leonardo. Assuming that such evidence could be received on a new trial it was evidence that could have been known to the counsel for the defendant if reasonable diligence had been exercised before the trial. The statement made by Phelps when he entered the hospital became a part of its public records and could have been seen by any one representing the defendant upon request. Officer Church arrived at the corner of Broadway and Madison avenue a few minutes after the homicide. He remained with Phelps until the arrival of the ambulance and went in the ambulance with Phelps to the hospital. It is alleged in the affidavits in opposition to the motion for a new trial that the newspapers of Albany published in great detail the facts as they were then ascertained in regard to the

homicide and as to what occurred immediately thereafter and that one of such newspapers named Officer Church as one of the persons who was present with Phelps upon the street soon after the homicide. And such affidavits further allege that it was common knowledge in Albany that Phelps had made statements in substance similar to those given in evidence on the Leonardo trial by Officer Church and by the physician in attendance at the hospital. The motion was heard before the justice who presided at the trial and he denied the same. The facts appearing upon such motion do not require a reversal of the order.

The judgment of conviction should be affirmed.

CULLEN, Ch. J., GRAY, HAIGHT, VANN and WERNER, JJ., concur.

Judgment of conviction affirmed.

### NOTE ON EVIDENCE AS TO ACTS OF CO-CONSPIRATORS.

**GENERALLY.**

In cases of conspiracy, when the combination is proved, the subsequent acts and declarations of the conspirators are not received as evidence of that fact, but to show what was done and the means employed in furtherance of it, and, generally, those details which unfold its extent, scope and influence upon the public or the individuals who suffer from the wrong. Cuyler v. McCartney, 40 N. Y. 222.

Where several persons are engaged together in the furtherance of a common illegal design, declarations of one confederate, which are not narratives of a past transaction but are made during the continuance of the conspiracy and with reference to, and as part of, the general scheme, are competent evidence against the others. People v. Pickens, 153 N. Y. 576.

Whenever common purpose or conspiracy by the defendants is shown, then acts and declarations of any one of them relating to the allged offense though in the absence of the others, is admissible, and the acts of one in the same common purpose become the ats of all. People v. Bassford, 3 N. Y. Crim. 219.

Declarations and acts of a co-conspirator, made in furtherance of the prosecution of the common object of the conspiracy, or constituting a part of the *res gestae* of some act done for that purpose, are the acts and declarations of all, and are admissible against them. People v. Murphy, 3 N. Y. Crim. 338.

It is not necessary that the persons whose declarations are offered should have been a party to the original concoction of the fraud if he, after full knowledge that it was committed, attempts to reap the benefits of the fraudulent transaction. Peterson v. Spear, 29 Pa. St. 478.

Each co-conspirator is bound by declarations of each of his co-conspirators done and said during the continuance of the conspiracy touching the object and conduct thereof, and it is immaterial at what time he became connected therewith, whether at its inception, at the very instant before the full accomplishment of the purpose of the conspiracy just before its final abandonment, or at any other time. Blain v. State, 33 Tex. Crim. 236.

Every act and declaration of each conspirator in furtherance of the general design is, in contemplation of law, the act and declaration of all the conspirators, and is therefore original evidence against each of them. Spies v. People, 10 West. Rep. 791, 12 N. E. Rep. 865.

Any joint action upon a material point or a collection of independent but co-operating acts, by persons closely associated with each other is sufficient to enable the jury to infer the concurrence of sentiment. U. S. v. Wilson, 60 Fed. 890.

### WHEN ADMISSIBLE.

Where the particular act of extortion upon which the indictment was based was done in pursuance of a conspiracy between the defendant and three others, the acts and declarations of the defendant's confederates, in the execution and furtherance of their common design, after the act alleged in the indictment, are admissible against the defendant. People v. Hall, 51 N. Y. 58.

Where there is sufficient evidence to justify the conclusion that different persons, charged with a crime, were all acting with a common purpose and design, although it does not appear that there had been a previous combination or confederacy to commit the particular offence, yet the acts and declarations of each, from the commencement to the consummation of the offence, are evidence against the others. Kelly v. People, 55 N. Y. 565.

Where it appears that a debtor and others have joined in a conspiracy to defraud the creditors of the former by a fraudulent disposition of his property, the acts and declarations of the debtor, made in the absence of the others, but in execution of the common purpose, and in aid of its fulfilment, are admissible against them. Dewey v. Moyer, 72 N. Y. 70.

Where the guilt of one of several defendants, jointly indicted for a felony, is sought to be established by evidence showing, or tending to show a conspiracy between him and the others for the commission of the crime, evidence as to acts or statements of the others must be confined to such statements as were made, or acts done, at times when the proofs in the case permit of a finding that a conspiracy existed, and where the acts or statements were in furtherance of a common design. People v. Kief, 126 N. Y. 661.

Where it is alleged in the indictment that persons have conspired together to commit an offense, and the proof tends to establish the existence of the conspiracy, the acts and declarations of each of the conspirators are binding upon, and to be regarded as the acts of the others, and the question of their guilt becomes one of fact for the jury. People v. Peckens, 153 N. Y. 576.

On trial of a charge of conspiracy to extort money, where the actual extortion of a specified sum is alleged and proved and a continuing design to blackmail is shown, a letter from one proved confederate on trial, written after the date of the specific extortion, but during the further carrying out of the conspiracy, is admissible against each of his confederates. People v. Hall, 51 App. Div. 57.

Where there is sufficient evidence to justify the conclusion that different persons charged with a crime were acting with a common purpose and design, although it does not appear that there has been a previous combination or confederacy to commit the particular offense, the acts and declarations of each, from the commencement of the consummation of the offense, are evidence against the others. People v. Van Tassel, 3 N. Y. Crim. 289.

The declarations of one K., who was one of the conspirators, although not a defendant, made during the continuance of the conspiracy and for the purpose on the part of the conspirators of carrying the same into full effect,—that they would do the same as they had done in the prior boycott of another party, and appeal to the merchants to take their advertisements out of the publishing company's paper, and appeal to subscribers; that if they had another battle, the pub-

lishing company would have to pay the expenses of the boycott,—were admitted in evidence against the the objections of the defendants. These declarations were made to one S., a workman in the publishing company's office, in an interview between the workman and two of the defendants, who had some time before tried to induce S. to join the conspiracy. *Held*, that the declarations in question, following efforts of G. and K. to win over S., may well be regarded as supplementary to those efforts, and so were acts in the prosecution of the objects of the conspiracy, and as such were admissible against defendants. State v. Glidden, 6 N. Y. Crim. 321.

Evidence as to the acts of alleged conspirators in procuring and filing in the name of another person, a false claim against the city for damage caused by the overflow of a sewer, examined, and held, to show an overt act in addition to the conspiracy agreement within the requirements of the Penal Code. People v. Miles, 22 N. Y. Crim. 9.

Where it has been shown that a defendant charged with larceny agreed with fellow-conspirators to hold money obtained from the complainant so as to return it if he threatened to complain, it is not error to admit evidence that one of the conspirators, after his arrest, offered to get the money from the defendant if the complainant would not lodge a complaint, for the proposal being in accordance with the agreement of the conspirators, was in furtherance of the conspiracy, or at least was a declaration accompanying and tending to characterize acts for which the conspirators were responsible. People v. Weiss, 23 N. Y. Crim. 140.

Where directors of a bank are charged with conspiracy to defraud, letters or statements by each or any of them to officers of such bank are held to be admissible against them all. Reg. v. Brown, 7 Cox C. C. 442.

To show that the writer was not a participator in the fraud, but was himself deceived, letters written by one defendant to another during the time when the conspiracy was alleged to exist, are held to be admissible. Rex v. Whitehead, 1 C. C. P. 67.

As being part of the *res gestae* letters written by one defendant to another during the time when the conspiracy was alleged to exist are admissible to disprove the allegation of fraudulent conspiracy. Zellerbach v. Allenberg, 99 Cal. 57.

State of mind with respect to subject of alleged conspiracy, prior

to its alleged formation, may be shown. U. S. v. Greene, 146 Fed. 784.

Where conspirators, in furtherance of their designs, organize an association, evidence of an agent employed thereafter, such agency having been shown, is admissible against his associates as showing what he did and said in their absence in furtherance of such design. Mckee v. State, 111 Ind. 378.

At the trial of an indictment for a conspiracy to procure persons to votes illegally at a certain caucus, evidence that fraudulent voters were spoken to by one of the conspirators before all of them had come into the scheme is admissible, in connection with proof that the others did come in and by implication adopted the acts. Com. v. Rogers, 181 Mass. 184.

Where it was charged that the defendant in order to commit the fraud impersonated a confederate by wearing his clothes, it was held proper to show that the defendant proposed the scheme to a person not named in the indictment. People v. Arnold, 46 Mich. 268.

**WHEN INADMISSIBLE.**
Acts or statements of one of the defendants prior to the formation of the conspiracy, or subsequent to its termination, by the accomplishment of the common purpose, or by abandonment, are not admissible as evidence against the others. People v. Kief, 126 N. Y. 661.

In no case can acts occurring after the conspiracy is formed be referred to to prove the existence of the conspiracy. People v. Brickner, 15 N. Y. Supp. 528.

Where the evidence is insufficient to prove a conspiracy, evidence of the acts or declarations of the alleged co-conspirator, performed or uttered when the defendant was not present, or, if present, not participating therein, or in some manner assenting thereto, is inadmissible against defendant. People v. Pavlik, 6 N. Y. Crim. 30.

The acts or statements of one person cannot be used for the purpose of affecting or establishing the guilt of another unless it is first proved, either by circumstances or direct proof, that these persons are engaged in some joint enterprise or object, and are exerting themselves to bring about such a joint result. Where that is the case, what one does for the purpose of aiding and promoting the common object is admissible as evidence against the other. Where such is not their relation, the act, the conduct, or the statement of one has no effect whatever upon the other. People v. Kerr, 6 N. Y. Crim. 406.

Declarations by an accomplice upon a trial of a charge of burglary,

made by him while on the way to the police station are inadmissible to show that the defendant participated in the crime. People v. Quinn, 22 N. Y. Crim. 75.

Acts and declarations of a defendant are not admissible as against his co-defendant where they were made subsequently to the arrest of the latter and therefore after he had ceased to act in carrying out the common purpose. State v. Grant, 86 Iowa, 216.

Where the charge was conspiracy to make a false arrest, arrests made subsequently to that complained of cannot be shown. State v. Davies, 80 Mo. App. 239.

The admissions of one defendant as to his own illegal and improper conduct cannot be received in evidence after his death in an action for conspiracy against his surviving co-defendants. Gaunce v. Backhouse, 37 Tex. App. 350.

Evidence of the acts and declarations of one of the alleged conspirators who has been acquitted is inadmissible against other defendants because if the first defendant was not a co-conspirator his acts and declarations could not be binding upon them. Paul v. State, 12 Tex. App. 346.

After a conspiracy is established, only the declarations of each member which are in furtherance of the common design can be produced in evidence against the other members. Declarations which are merely narrative as to what has been or will be done, are incompetent except against the defendant making them, or in whose presence they are made. Spies v. People, 10 West. Rep. 791, 12 N. E. Rep. 865.

## NECESSITY OF PRELIMINARY PROOF OF CONSPIRACY.

Evidence of acts of co-conspirators sometimes introduced before proof of existence of conspiracy under promise of prosecution to establish the existence of such conspiracy at a later stage of the case. Place v. Minster, 65 N. Y. 89.

If the circumstances of the case are so peculiar and urgent as to require such a course, the acts and declarations of a co-conspirator may in some jurisdictions be introduced in the first instance before proof of the agreement itself. State v. Thompson, 69 Conn. 720.

But this is not so in Mississippi, where the court has declared that it is manifestly impossible to reconcile such a doctrine with the admitted principles of evidence or the great object of the law, to secure a fair and impartial trial. Browning v. State, 30 Miss. 656.