The People of the State of New York, Respondent, v Gary Mandel, Michael De Vito and Theodore Buckley, Appellants.

Second Department, March 20, 1978

### APPEARANCES OF COUNSEL

*Goldman & Hafetz (Lawrence Hochheiser, Frederick P. Hafetz, Lawrence S. Goldman* and *Kenneth Aronson* of counsel), for Gary Mandel, appellant.

*Murray S. Bornstein* for Michael De Vito and *Andrew E. Kuchinsky* for Theodore Buckley, appellants (one brief).

*John J. Santucci, District Attorney (Annamarie Policriti* and *Bruce Whitney* of counsel), for respondent.

*Greenbaum, Wolff & Ernst (Harriet F. Pilpel, Frederic S. Nathan, Eve W. Paul* and *Michael J. Burnett* of counsel), for Planned Parenthood of New York City, Inc., *amicus curiae.*

*Elizabeth M. Schneider* and *Nancy Stearns (Chris Howard, Richard Greenblatt* and *Fannette Pollack* on the brief), for Queens Women Against Rape and another, *amici curiae.*

### OPINION OF THE COURT

O'CONNOR, J.

The judgments appealed from are reversed, on the law, and a new trial is ordered.

The defendants were indicted for the crimes of rape in the first degree, sodomy in the first degree, sexual abuse in the first degree and assault in the second degree. Although the alleged crimes occurred on April 4, 1975, the trial did not commence until October 21, 1975. The trial court determined that the provisions of CPL 60.42 (L 1975, ch 230, eff Sept. 1, 1975) were applicable to the trial of this case. CPL 60.42 provides as follows:

"§ 60.42 Rules of evidence; admissibility of evidence of victim's sexual conduct in sex offense cases.

"Evidence of a victim's sexual conduct shall not be admissible in a prosecution for an offense or an attempt to commit an offense defined in article one hundred thirty of the penal law unless such evidence:

"1. proves or tends to prove specific instances of the victim's prior sexual conduct with the accused; or

"2. proves or tends to prove that the victim has been convicted of an offense under section 230.00 of the penal law within three years prior to the sex offense which is the subject of the prosecution; or

"3. rebuts evidence introduced by the people of the victim's

failure to engage in sexual intercourse, deviate sexual intercourse or sexual contact during a given period of time; or

"4. rebuts evidence introduced by the people which proves or tends to prove that the accused is the cause of pregnancy or disease of the victim, or the source of semen found in the victim; or

"5. is determined by the court after an offer of proof by the accused outside the hearing of the jury, or such hearing as the court may require, and a statement by the court of its findings of fact essential to its determination, to be relevant and admissible in the interests of justice."

Pursuant to CPL 60.42, the defendants made an offer of proof concerning the complainant's prior sexual conduct. After a hearing and a review of the various exhibits submitted by defendants, the trial court ruled that subdivisions 1 through 4 were not applicable and that the evidence offered was not "relevant and admissible in the interests of justice" under subdivision 5. Evidence of the complainant's prior sexual conduct was therefore barred at the trial.

Defendants contend that application of CPL 60.42 violated section 10 of article I of the United States Constitution, which prohibits the Legislature from passing an ex post facto law. In *Beazell v Ohio* (269 US 167, 170), which involved a statutory change making it more difficult for two persons jointly indicted to receive separate trials, the Supreme Court held that: "it is now well settled that statutory changes in the mode of trial or the rules of evidence, which do not deprive the accused of a defense and which operate only in a limited and unsubstantial manner to his disadvantage, are not prohibited." In *People v Nival* (33 NY2d 391) the Court of Appeals held that application of CPL 60.25 to a crime committed prior to the effective date of that statute did not violate the ex post facto clause. CPL 60.25 newly provided that where a witness cannot make an in-court identification, but has on a previous occasion identified the defendant, any other witness may then establish that the defendant is the same person that the eyewitness identified on the previous occasion. Although CPL 60.42 restricts, to some extent, a defendant's ability to attack the credibility of a complaining witness, the statute is not an impermissible ex post facto law *(People v Patno,* 55 AD2d 965; *People v Conyers,* 86 Misc 2d 754). The limitation does not deprive the accused of a defense and certainly does not involve as substantive a right as that involved in *People v*

*Nival (supra)*. Furthermore, if the limitation were to raise substantial ex post facto concerns in any particular case, such problems would be obviated by subdivision 5 thereof, which permits the admission of evidence of a complainant's prior sexual conduct where the "interests of justice" would thus be served.

Defendants assert that CPL 60.42 permits a trial court to prohibit the admission of relevant evidence in order to protect the privacy of a complaining witness. They contend that this prohibition violates their right to a fair trial under the Sixth and Fourteenth Amendments and that CPL 60.42 is therefore unconstitutional.

CPL 60.42 represents a legislative determination that evidence of a complainant's past sex life "seldom elicits testimony relevant to the issues of the victim's consent on credibility, but serves only to harass the alleged victim and confuse the jurors. Focusing upon the immaterial issue of a victim's chastity tends to demean the witness, discourages the prosecution of meritorious cases, and leads to acquittals of guilty defendants" (Memorandum of Assemblyman Stanley Fink, NY Legis Ann, 1975, pp 47-48). CPL 60.42 codifies, in the trial of sex offenses, what has been the prevailing view in the trial of all other offenses, i.e., that "[t]here is a duty to protect him from questions which go beyond the bounds of proper cross-examination merely to harass, annoy or humiliate him" (see *Alford v United States,* 282 US 687, 694; cf. *People v Fiore,* 34 NY2d 81; *People v McKinney,* 24 NY2d 180; Thayer, Preliminary Treatise on Evidence, p 266; McCormick, Evidence [2d ed], § 185).

The exclusion of evidence of a complainant's prior sexual conduct has been upheld in other jurisdictions upon the very grounds relied upon by the Legislature in enacting CPL 60.42, to wit, that such evidence is not relevant and is highly prejudicial (see *People v Blackburn,* 56 Cal App 3d 685; *State v Geer,* 13 Wn App 71; *Lynn v State,* 231 Ga 559). CPL 60.42 serves the salutary purpose of restricting the unfair and irrelevant cross-examination of the victims of sexual crimes. By including subdivision 5 within the statute, the Legislature has, however, recognized that there may be exceptions to this new rule and that there may indeed be times when a victim's sexual conduct is highly relevant and that evidence of such conduct should therefore be admissible. The exception, therefore, affords a defendant the opportunity to demonstrate that

the victim's sexual conduct is relevant and to subsequently confront the victim with such evidence (cf. *People v Conyers, 86 Misc 2d 754, supra).*

Although we find that CPL 60.42 is constitutional, we are constrained to reverse the judgments because the evidence offered by defendants, but excluded by the trial court, was of substantial probative value and was not offered primarily to demean or harass the victim. Such evidence directly involved not only the complainant's credibility and her mental and emotional condition, but, to a marked degree, her ability to perceive and recall past events. The relevance of the evidence therefore clearly outweighed its possible prejudicial implications. The basic essence of a fair trial is that a defendant be permitted "to probe into the influence of possible bias in the testimony of a crucial identification witness" *(Davis v Alaska, 415 US 308, 319; Alford v United States, 282 US 687, supra).* If the defense be not afforded the full and proper right of confrontation, it is difficult indeed, if not impossible, to determine the truth; and a trial, as we all so often say, is but a search for the truth.

Pursuant to the exception set forth in subdivision 5 of CPL 60.42, the defendants made an offer of proof at the outset of the trial. The offer proposed the admission of evidence of: three similar false rape complaints previously made by the complainant; certain records of South Oaks Hospital prepared in the regular course of business while complainant was a patient at that hospital from April 11, 1972 to May 22, 1972; statements by three males, two 18 years of age and one 31 years of age, that, *inter alia,* in sexual situations with complainant she had refused to let them touch her breasts, a statement by an 18-year-old male that he had seen complainant's father brutally beat her with his naked fists; a photograph in *Mixer* magazine allegedly of complainant, which accompanied a solicitation for women to participate in multiple and unusual sorts of sexual activity; and the minutes of a preliminary hearing held on May 12, 1975.

The trial court held a brief hearing out of the presence of the jury and, at the request of defense counsel, who were hesitant to open their files to the prosecution, made an *in camera* examination of the proffered documentation and concluded that such evidence was totally inadmissible. At the time this determination was made the trial court was, of course, unaware of the theory of the defense and could not

have had any knowledge of the many inconsistencies which would subsequently surface in the complainant's testimony. The conclusion is therefore valid that the trial court's ruling at that early stage was eminently fair and proper. However, as the trial progressed and both the theory of the defense and the complainant's conflicting versions of the event were revealed in the glare of searching cross-examination, we conclude, fortified as we are by the perfect vision of hindsight, that the trial court should have reconsidered and reversed its earlier ruling (cf. *People v Goggins,* 34 NY2d 163, cert den 419 US 1012).

The complainant was the principal witness for the prosecution and her credibility and emotional and mental history were substantial factors at the trial. She testified that defendant Mandel had telephoned her several times on April 4, 1975, the day of the alleged crime, and that she returned his calls. Mandel asked her to come to his house, which was several blocks away, so that they could discuss a new course being offered at Brooklyn College. Complainant went to the Mandel home, entered through the front door, and sat down at the kitchen table. She did not see anyone else in the house. After a short conversation complainant asked Mandel for a glass of water. When she drank the water she started getting sleepy, dizzy and tired. The next thing complainant remembered was that she was in the Mandel basement being pushed onto and against a couch. As she was struggling, defendants De Vito and Buckley entered the basement from a back room. Complainant started screaming, protesting and crying, but the defendants held her down and ripped off her shoes, socks, dungarees and underwear. Complainant's testimony then followed with a long, lurid and detailed recital of vicious, savage and sadistic sexual assaults and abuse including, but not limited to, deviate and unnatural sex and bestiality.

The complainant then testified that when the opportunity presented itself she ran naked from the waist down out of the back door of the basement and stood, paralyzed, behind some bushes in an alleyway. From that hiding spot she saw the defendants leave the Mandel house in an attempt to find her. As she was watching the defendants, she ran towards a house with a light on, knocked on the door and stumbled into the home of Murray and Lila Raber.

Although portions of the police reports of Detectives Di Pietro and Gustine tend to support parts of the complainant's

testimony, there also appear therein startling, baffling and important contradictions and discrepancies.

Similar contrary, incongruent and inconsistent articulation appears in the statement complainant gave to Jane Shaw Wiseman of the New York State Criminal Victims Compensation Board.

It was partially revealed on cross-examination, and it is documented by the transcript, that complainant lied when she testified at a preliminary hearing on May 12, 1975. She there swore under oath that she had been a virgin prior to the alleged rape and that she had never been treated or institutionalized for a mental illness.

As the defense brought these inconsistencies between the complainant's trial testimony and her previous statements to light the theory of the defense became apparent. The defendants contended that the complainant either instigated or consented to any sexual activity which occurred. They alleged that the rape complaint was the result of the humiliation she had suffered and the resultant anger and fury that possessed her when water balloons, purposely placed by the complainant in her bra, fell and burst upon the floor to the taunting, scornful and infuriating laughter of the defendants. As incredible as this defense may appear, the evidence offered by defendants, but not admitted by the trial court, tends to support defendants' position—at least to the extent that the issue should have been fully explored and then submitted to the jury.

## I

### PRIOR RAPE COMPLAINTS

It should be noted at the outset that the evidence of three prior similar false rape complaints does not constitute evidence of prior sexual conduct under CPL 60.42. If anything, such evidence would tend to rebut an inference that a person had previously engaged in such sexual activity. Nonetheless, and even though such evidence was not proscribed by CPL 60.42, it was proper for the trial court to examine and rule on its admissibility since, in a less bizarre case, it is likely that the prejudicial nature of the evidence might well outweigh its probative value. Although evidence of prior similar false rape complaints has been admitted in other jurisdictions *(People v Hurlburt,* 166 Cal App 2d 334; 3A Wigmore, Evidence [Chadb-

ourn rev], § 963), there are no New York cases on point. The principle relied upon by defendants, that such evidence permits an inference that the crimes alleged had not been committed, is supported by those cases which allow evidence of similar crimes to be admitted against a defendant to show motive, intent or predisposition to commit the crime in issue (see *People v Molineux,* 168 NY 264; *People v Mann,* 31 NY2d 253; *People v La Rue,* 47 AD2d 649).

The evidence offered by the defense consisted of (1) a statement that witness "A"[1] would testify that complainant's father had informed him that complainant had told her father that a former employer of the complainant had attempted to rape her; (2) a statement, signed by witness "B", that the complainant had come to her door in December, 1973, at about midnight, asking for help and alleging that someone had attempted to rape her and (3) 14 police reports prepared between September 11, 1974 and April 17, 1975 concerning an attempted rape of the complainant, reported by her to the police, and the subsequent police investigation.

The statement of witness "A" was properly excluded since it is hearsay and does not fall within any exception to the hearsay rule.

The statement by witness "B", however, was relevant and admissible. The statement signed by "B" indicated that she lived only nine blocks from complainant's home and that she would testify that the complainant rang her doorbell late at night, had a torn jacket and claimed that a male in a car had threatened her with a knife and attempted to rape her. Complainant asked "B" to call her father, who arrived 15 minutes later but did not seem overly distraught. Although the alleged rape reported by the witness is not entirely similar to the crime here, nor is it clear that the claim was false, the manner in which the complainant arrived at the Raber residence is nearly identical to the situation experienced by "B" and, as such, compels one to question the veracity of the present complaint.

The police reports offered by the defense indicate that on September 11, 1974 complainant was abducted by a 24-year-old White male, five feet six inches tall, weighing 150 pounds, with brown hair and eyes. Complainant entered the perpetra-

---

1. For obvious reasons the true names of the witnesses have been deleted from this opinion.

tor's car, bearing New Jersey license plate number WAN 550, and was driven to an isolated area, where the perpetrator forced her to disrobe and attempted to rape her. The complainant struggled and escaped. The police investigation determined that the vehicle was registered to witness "C", who denied any part in the crime, denied having been in New York for several years and who stated that no one else had access to, or was permitted to use, his car. The investigation was closed because of insufficient information. Although the police department's eight-month investigation might support an inference that the complaint was genuine (see *People v Rincon-Pineda,* 14 Cal 3d 864), the statements by witness "C", coupled with the defendants' offer to produce him, required that the jury be permitted to consider the evidence. It is with considerable hesitancy that we conclude that these matters should have been introduced into evidence. Yet, under the peculiar, bizarre and extraordinary circumstances of the case, it is indicated that, in the ceaseless search for the truth, the probative value involved tends to outweigh the prejudice attendant upon their admission.

## II

### RECORDS OF SOUTH OAKS HOSPITAL

Defendants' offer of proof also consisted of records of South Oaks Hospital, prepared in the normal course of business while complainant was a patient at the hospital from April 11, 1972 to May 22, 1972. Although such records were indubitably not envisioned as coming within the ambit of CPL 60.42, it was proper to examine them within the context of that section, replete as they were with references to complainant's prior sexual conduct and history. The trial court held a tight rein on the cross-examination of the complainant concerning these hospital records. The defendants were permitted to establish, in the main, that the complainant had been a patient at the hospital for about a month following a suicide attempt and that she had undergone shock therapy and that for a month prior to April she had been seeing a psychologist. She was further permitted to testify that she would stay in one position and stare into space for long periods of time and that she had been given medication. Objections were sustained however to the following lines of inquiry: whether the complainant had been admitted to South Oaks upon the certification of two physicians; whether she signed herself out of the

institution contrary to medical advice; whether she had stated that she hated boys, including her brothers, and that she would kill any children she might have; whether she smoked marijuana three times a day; and whether she had ever been treated for excessive alcohol consumption. Furthermore, pertinent inquiry was prevented as to whether the complainant had complained that her nose was too large and her breasts too small; whether she had threatened to commit suicide if she did not receive corrective surgery in both areas; and whether she suffered hallucinations.[2]

It is the People's contention that, despite these strictures, the jury was generally apprised of complainant's mental history and that this should be sufficient. Yet the record discloses that in response to persistent questions concerning her mental condition and the records of the hospital, objections were either sustained or answers given in the negative. But the hospital records clearly demonstrate that the answers to most of these questions should have been in the affirmative and further established that the complainant felt guilty about her sexual promiscuity and her parents' ignorance of her conduct in this area.

Although it may be proper to exclude a witness' hospital records from evidence under certain circumstances *(People v Kampshoff,* 53 AD2d 325), where the witness denies relevant facts contained in such records, the records are admissible not only to impeach, but to demonstrate fully the witness' mental and emotional condition *(People v Rensing,* 14 NY2d 210).

*Rensing* is authority for the proposition that the mental history of a witness is relevant not alone as to credibility, but also as to the ability to perceive and remember events. There the Court of Appeals ordered a new trial because of newly discovered evidence that a codefendant who had testified in his own behalf and implicated the defendant had a history of mental illness. The court, in reversing, held that the jury had to be aware that the witness had (p 214): " 'visual and auditory hallucinations with marked memory defect', that he had been diagnosed 'as a case of Paranoid Schizophrenia' and that he had been discharged from a sanitarium in 1950 [12 years prior to the crime and 13 years prior to his testimony] 'against medical advice' ".

---

2. The only reference in the record to complainant's hallucinations speaks of that condition some six days after, and as a result of, the alleged crime. All reference to hallucinations while a patient at South Oaks was excluded.

Here, as in *Rensing,* the jury was prevented from learning that the complainant had hallucinations and that she had been diagnosed as a schizophrenic-catatonic type. There the witness was found to be suffering from a mental condition that went back some 13 years prior to trial. Here the time lapse was less than 3 years. There the court held (14 NY2d, at p 214): "On this appeal, our inquiry must be, what would have been the reactions of the jurors had they been made aware that there was 'something mentally wrong' with Krombholz and had they known that he had 'visual and auditory hallucinations with marked memory defect', that he had been diagnosed 'as a case of Paranoid Schizophrenia' and that he had been discharged from a sanitarium in 1950 'against medical advice'? We find it impossible to answer this question. On the one hand, the jury might have been reluctant to attach credence or weight to Krombholz' story and base its verdict of guilt solely on the appellant's confession—which he repudiated on the stand—and the other bits of evidence adduced by the prosecution. On the other hand, the jurors might have been persuaded that the appellant was guilty even without Krombholz' testimony or they might have concluded that, mentally ill though he was, he was capable of reporting his talks with the appellant and describing the events which he observed before and after the killing. However, in a case such as this, when the punishment is death, we would not have our verdict to affirm rest on possibility or surmise. There is no need to remit the case for a hearing on the motion. On the record as it stands, the appellant is entitled, in the interests of justice, to a new trial (Code Crim. Pro., § 528)."

There, as here, the jury was totally prevented from properly viewing the devastating picture of the complainant's mental status at the time the complaints involved were lodged.

Prejudice to the defendants was grossly compounded when the prosecutor was permitted in summation to airily dismiss the substantial and significant impact of complainant's true mental condition by understating that "at one time in her life [she] realized she needed treatment for a 30-day period" because she suffered "from depression". It was dirty pool to then argue that the defense had failed to prove that complainant's mental problems were any more substantial than that. Standing alone, this constitutes reversible error (see *People v Baker,* 54 AD2d 547). In truth, as already noted, the diagnosis of the complainant was "schizophrenic-catatonic type", and

she discharged herself from the hospital against the advice of the attending physicians.

## III

### THE THREE STATEMENTS REGARDING COMPLAINANT'S PRIOR SEXUAL CONDUCT

Defendants offered an affidavit from witness "D", an 18-year-old Kingsborough Community College student, dated April 25, 1975. "D" stated that complainant had performed fellatio on him, but that she would not let him touch her breasts. He also stated that various other males had told him of sexual relations had by them with complainant. In a similar affidavit, dated July 13, 1975, witness "E", an 18-year-old university student, stated that he had sexual relations, both normal and deviate, with complainant on five other occasions, during the course of which the complainant had never permitted him to touch her exceptionally large breasts. Since April 4, 1975 it had appeared to him as though she had no breasts at all. She had told him that she was sexually active and "E" believed that complainant was willing to have sex with anyone at any time. Witness "F", married and the father of two children, was a former employer of complainant. In an affidavit dated April 16, 1975, "F" stated that he too had sexual relations, both normal and deviate, on approximately 12 occasions, with complainant and that she never allowed him to touch her breasts and had told him that she was sexually promiscuous.

These affidavits are the very type of evidence which the Legislature has determined should normally be inadmissible (see Memorandum of Assemblyman Fink, NY Legis Ann, 1975, pp 47-48, *supra*). Under the circumstances of this case, however, portions of these statements go directly to the very core of the defense. Defendants contend that complainant brought a rape complaint because she was humiliated and embarrassed when the water balloons fell out of her bra and burst upon the floor. When the defendants laughed at this incredible spectacle, the fury and wrath of the complainant knew no bounds and, the defense contends, could well have triggered the very serious charges set forth in the complaint. In simple justice, the trial court should have permitted the proposed witnesses to testify that in sexual situations with complainant, where to do so would have been natural, she

refused to allow them to touch her breasts. Any testimony concerning the exact nature of the sexual encounters, their frequency, or the complainant's statements or reputation was properly excluded as immaterial and prejudicial.

## IV

### BROKEN NOSE

In an affidavit dated April 20, 1975, Kevin Gueli, an 18-year-old employee of East Coast Meats, stated that he saw a man who, he had been told, was complainant's father, beating her with his fists. He was aware that complainant was sexually promiscuous. The affidavit must be considered in conjunction with the other evidence adduced at the trial. The testimony demonstrated that on April 4, 1975, when complainant was brought to the emergency room of Peninsula General Hospital, her head was tender and bruised but her nose was clear.

When complainant returned to the hospital on April 5, 1975, her nose was broken. Not only did this evidence support a conviction for assault, it permitted the jury to infer that complainant had resisted the defendants' attack. Defendants contended, and attempted to introduce evidence, that complainant's injuries were either self-inflicted or the result of her having been beaten by her father. The discovery of the broken nose on April 5, 1975, although it had not been substantially damaged on April 4, 1975, supports this position. Once testimony concerning injuries not present on April 4, 1975 was admitted, it was improper for the court to prevent inquiry concerning the source of those injuries. As part of the defendants' efforts to demonstrate that the broken nose was not caused by them, Gueli's testimony regarding complainant's father's prior beating of his daughter should have been admitted. If no evidence of injuries sustained subsequent to April 4, 1975 had been offered, the testimony would not have been relevant. It should be added, as noted above, that Gueli's statements regarding complainant's sexual reputation were properly excluded.

The error in prohibiting Gueli from testifying was compounded by the trial court's refusal to permit cross-examination of the complainant and her father as to how and when her nose was broken.

# V

## PHOTOGRAPH IN MIXER MAGAZINE

Defendants attempted to introduce into evidence a semi-nude photograph, allegedly of the complainant, which accompanied an advertisement in *Mixer* magazine. The advertisement stated, *inter alia:* "Couple seeks young women * * * to participate in all the cultures". The defendants alleged, and De Vito was permitted to testify, that an issue of that magazine had been present at the Mandel residence at the time of the alleged crime and that complainant identified the photograph as that of herself. De Vito was permitted to describe the photograph and the accompanying solicitation. It was proper for the trial court to exclude the actual picture and advertisement. The defendants were able to make their point and, although admission of the photograph might have tended to buttress De Vito's testimony, the resulting prejudice would have substantially outwieghed the photograph's probative value (cf. *People v Fiore,* 34 NY2d 81, *supra).*

# VI

## THE PRELIMINARY HEARING

At the trial defendants were permitted to demonstrate that the complainant had lied at the preliminary hearing when she denied that she had ever been institutionalized. The defendants were foreclosed from showing that she had lied when she stated that she was a virgin. The cross-examination of complainant at the preliminary hearing regarding her prior sexual conduct was irrelevant and improper. Since the prosecution did not elicit such testimony at the trial, CPL 60.42 (subd 3) was inapplicable. Although a defendant should normally be allowed to prove that a witness has lied at a prior judicial proceeding, questioning or rebuttal of complainant's statement as to her virginity would have only been cumulative and the ensuing substantial prejudice did not warrant the admission of cumulative evidence.

Although reversal and a new trial are appropriate, based upon the severe restrictions imposed upon the defendants, several other matters deserve discussion.

■ Both Janet Isaacowitz and Timothy Skelly gave alibi testimony for the defendants. On cross-examination the prosecution elicited the fact that the witnesses had failed to appear

at the District Attorney's office to provide information, although requested to do so. On summation it was argued that their failure to appear made their alibi testimony unworthy of belief. Such an argument has previously been characterized by this court as "fundamentally unfair" (People v Hamlin, 58 AD2d 631, 632), and in this instance provides a further basis for reversal.

Prior to the trial the defendants subpoenaed records from Planned Parenthood of New York City, Inc. concerning the complainant. The trial court, after an *in camera* inspection, ruled that the records were confidential and privileged under CPLR 4504 and granted Planned Parenthood's motion to quash the subpoena. The trial court further ruled that the information was not material and relevant to the issues at trial. Although the confidentiality of such records has been upheld (see *People v Bartholomew*, 73 Misc 2d 541; *People v Dodge*, 73 Misc 2d 80), the State's policy interests in protecting the confidentiality of the physician-patient relationship must give way to a defendant's constitutional right to confront a prosecution witness (People v Maynard, 80 Misc 2d 279, citing Davis v Alaska, 415 US 308, supra). It was improper for the trial court to exclude the records based upon the physician-patient privilege. However, after examining the documents in question, we agree that the records were properly excluded as not being relevant or material. In addition we strongly approve of the procedure followed by the trial court. Not until it has determined, *in camera,* that such records are relevant and admissible should defendants be permitted to see the records (cf. *People v Goggins*, 34 NY2d 163, cert den 419 US 1012, supra).

On April 12, 1975 defendant Buckley's father, Theodore Buckley, Sr., signed a written statement concerning the events in question. The statement was based upon conversations Mr. Buckley, Sr. had with defendants Buckley and De Vito and contradicted De Vito's testimony at trial on several material points. On October 24, 1975 a subpoena for Mr. Buckley, Sr. was served upon Mrs. Buckley at the Buckley home. The prosecution, despite substantial efforts, was unable to locate Mr. Buckley, Sr. Both Mrs. Buckley and defense counsel asserted that they did not know how Mr. Buckley, Sr. could be contacted. On October 28, 1975, after a hearing, the trial court signed a material witness order for Mr. Buckley, Sr. The trial court concluded that "there is no doubt * * * that parties in

this trial are concealing Mr. Buckley's whereabouts". The trial court indicated that it would grant a continuance to give the People a chance to locate Mr. Buckley, Sr., but the defendants refused to agree. The trial court determined that evidence with respect to Mr. Buckley, Sr. should be in the record and available to the jury although his statement was not permitted into evidence. An Assistant District Attorney and two police officers testified to the efforts made to locate Mr. Buckley, Sr. In addition, the prosecution was allowed to use the contradictory statements in Mr. Buckley, Sr.'s statement during the cross-examination of defendant De Vito.

Although Mr. Buckley, Sr. was not a witness to the alleged crime, his testimony, as indicated by his signed statement, was extremely material. The key factor at the trial was the relative credibility of complainant and De Vito, the only persons present at the Mandel home who testified at the trial. In *People v Rodriguez* (38 NY2d 95, 98-99), the Court of Appeals concluded that it had been proper for the trial court to charge that defendant's failure to call his wife as a witness was a matter for the jury to consider. The court stated that:

"Ordinarily, a court may not comment upon a defendant's failure to testify or otherwise come forward with evidence, but, once a defendant does so, his failure to call an available witness who is under defendant's control and has information material to the case may be brought to the jurors' attention for their consideration *(People v Leonardo,* 199 NY 432, 436; *People v Hovey,* 92 NY 554, 559; 2 Wigmore, Evidence [3d ed], §§ 285-291; 1 Wharton's Criminal Evidence [13th ed, 1972], §§ 148-149, pp 249-254; 4 Bender's NY Evidence, § 245.03, subd [8]; McCormick, Evidence [2d ed, 1972], § 272, p 656 *et seq.;* but see *People v Conklin,* 39 AD2d 160, 162).

"Though the rule ordinarily does not apply when a witness is equally accessible to both parties (Richardson, Evidence [10th ed], § 92), it may come into play even then if it appears that such a witness is favorable to one party and hostile to the other. (See discussion in McCormick, Evidence [2d ed, 1972], § 272, pp 657-658; 2 Wigmore, Evidence [3d ed], § 288.)

"In both instances, respected authorities make clear that, so long as comment or instruction on the absence of the witness is unaccompanied by one on the accused's personal failure to testify, no constitutional right is infringed *(Graves v United States,* 150 US 118, 121 [semble]; *United States v Fox,* 97 F2d 913, 915 [L. HAND, J.]; 8 Wigmore, Evidence [McNaughton rev,

1961], § 2273; see, also, discussion in 4 Bender's, NY Evidence, § 242.14, subd [1], par [c]; Cook, Constitutional Rights of the Accused-Trial Rights, § 62, pp 240-242, and cases cited therein)."

Here, although Mr. Buckley, Sr.'s presence was sought by the prosecution, there can be no doubt that defendant Buckley was, at least inferentially, responsible for his father's disappearance. "A spouse or relative is perforce deemed to be under the defendant's control" *(People v Rodriguez, supra,* p 98, n 1). Since it would have been proper for the trial court to have directly commented upon Mr. Buckley, Sr.'s flight, it follows that an inference of consciousness of guilt could be developed through testimony presented by the prosecution.

The unavailability of Mr. Buckley, Sr. was clearly the result of actions by defendant Buckley, and possibly others, taken in the belief that his presence might indeed prove damaging to defendants' case. That such efforts to secrete Mr. Buckley, Sr. may have had some tendency to prove a consciousness of guilt is a reasonable deduction and the admission into evidence of the testimony concerning the prosecution's attempts at locating him was proper (cf. *People v Shilitano,* 218 NY 161, 179; *People v Plummer,* 36 NY2d 161; *People v Potter,* 50 AD2d 410). Although a consciousness of guilt could not generally be drawn regarding Buckley's codefendants, they did not move for a severance, nor could they have since it was a vital part of their trial strategy that they be tried together and since they had previously agreed, unequivocally, to a joint trial. It should further be noted that it is normally improper for a prosecutor to testify at a trial *(People v Chapman,* 39 NY2d 790). This rule, however, is open to exception where the prosecutor's credibility is not in issue and his testimony is necessary to further the ends of justice (cf. *United States v Pepe,* 247 F2d 838; *People v Tait,* 234 App Div 433, affd 259 NY 599).

The cross-examination of defendant De Vito, based upon his statements to Mr. Buckley, Sr., was also proper. If Mr. Buckley, Sr. had been available he would either have testified to his signed statement or he could have been impeached by its contents. The defendants, who first concealed Mr. Buckley, Sr. and then refused to agree to a continuance to allow the prosecution to locate him, cannot be permitted to obstruct justice by their questionable actions. The defendants' reliance on *People v Fitzpatrick* (40 NY2d 44, 53) is misplaced since

that case relied not only upon a witness' failure to recollect events, but upon the fact that the prosecution had been "amply warned by [the witness] that his in-court testimony would be that he did not recall."

Although the point is moot in the light of our reversal of the convictions, it should be noted that there was no inconsistency in the verdict.

The defendants were acquitted of the crimes of rape and sodomy and convicted of the crimes of sexual abuse and assault. Based upon the evidence at the trial, the guilty verdict was supported by the record and there is no question that an acquittal on rape and sodomy counts does not preclude a conviction for sexual abuse (*People v Crandall,* 53 AD2d 956; *People v Tucker,* 47 AD2d 583). Although complainant's testimony, standing alone, supported a conviction on all three counts, the hospital records, which revealed the absence of semen and no damage to complainant's anal area, provided a rationale for the verdict. The lack of medical corroboration of the crimes of rape and sodomy and the testimony that the complainant was drugged during the events sufficiently explain the verdict.

Defendants also argue that the count charging sexual abuse in the first degree must be dismissed upon the authority of *People v Jackson* (60 AD2d 893), because the indictment, without further elaboration, merely sets forth the statutory definition of the crime. This contention has been urged for the first time approximately eight months after oral argument of this appeal and just prior to the rendition of our determination. We therefore refrain from passing upon this contention, without prejudice to the raising of this point by any of the defendants upon the remand to Criminal Term.

There is one additional point raised on appeal which merits discussion.

At the sentencing the court took into account the defendants' refusal to discuss the case with the Probation Department. The court was informed that defendants had refused to discuss the matter upon advice of counsel since, if successful on appeal, such statements might be admissible at a retrial. The sentencing court stated: "I don't accept that * * * because any statement your client may make to probation in the event that you were successful on an appeal would not, under any circumstances, be admissible on a retrial of this indictment." Although we do not consider an indeterminate sen-

tence of five years to be necessarily excessive, the importance that the sentencing court attached to defendants' refusal to speak with the Probation Department is demonstrated by the court's putting over of the sentencing of defendant Buckley after he indicated a willingness to speak with that department. The test for determining the voluntariness, and therefore admissibility, of inculpatory statements is whether such statements were " 'extracted by any sort of threats or violence' " *(Hutto v Ross,* 429 US 28, 30). Under this test, any statements made to the Probation Department would clearly be inadmissible at the retrial on the People's direct case because there is certainly an "implied promise" that candor with the Probation Department may result in a recommendation of leniency. It is unclear, under the rule enunciated in *Harris v New York* (401 US 222), that such statements could be admitted into evidence for impeachment purposes (see *People v Rodriquez,* 48 AD2d 691). Albeit cautious, it was proper for the defendants, upon advice of counsel to refuse to speak with the Probation Department.

RABIN, J. (concurring). I agree that the judgments should be reversed and a new trial ordered, but not for all of the reasons set forth by Mr. Justice O'CONNOR in his opinion.

I conclude that defendants did not receive a fair trial primarily because the defense was improperly restricted in the exploration of complainant's mental and emotional history as disclosed by the records of South Oaks Hospital. While the hospital records per se were properly refused admission without redaction of those matters relating to complainant's sexual history, defendants' counsel should have been permitted to fully explore those portions thereof which bore on the credibility and emotional and mental history of complainant, and allowed a broader latitude in cross-examination based upon those records.

In addition, I agree with Mr. Justice O'CONNOR that defendants were prejudiced by the prosecutor's summation.

However, I agree with the views expressed by Mr. Justice MARTUSCELLO in his dissenting opinion to the effect that the proof of prior rape complaints, the three statements regarding complainant's prior sexual conduct, and the testimony of Kevin Gueli were properly excluded.

MARTUSCELLO, J. (dissenting). The defendants were indicted for the crimes of rape in the first degree, sodomy in the first

degree, sexual abuse in the first degree and assault in the second degree. After a protracted jury trial they were convicted of the crimes of sexual abuse in the first degree and assault in the second degree.

The defendants made an offer of proof pursuant to CPL 60.42 before the trial commenced. That section provides:

"§ 60.42 Rules of evidence; admissibility of evidence of victim's sexual conduct in sex offense cases.

"Evidence of a victim's sexual conduct shall not be admissible in a prosecution for an offense or an attempt to commit an offense defined in article one hundred thirty of the penal law unless such evidence:

"1. proves or tends to prove specific instances of the victim's prior sexual conduct with the accused; or

"2. proves or tends to prove that the victim has been convicted of an offense under section 230.00 of the penal law within three years prior to the sex offense which is the subject of the prosecution; or

"3. rebuts evidence introduced by the people of the victim's failure to engage in sexual intercourse, deviate sexual intercourse or sexual contact during a given period of time; or

"4. rebuts evidence introduced by the people which proves or tends to prove that the accused is the cause of pregnancy or disease of the victim, or the source of semen found in the victim; or

"5. is determined by the court after an offer of proof by the accused outside the hearing of the jury, or such hearing as the court may require, and a statement by the court of its finding of fact essential to its determination, to be relevant and admissible in the interests of justice."

Defendants' offer of proof consisted of what they characterized as evidence of three similar false rape complaints previously made by the complainant; certain records of South Oaks Hospital prepared in the regular course of business while complainant was a patient at that hospital from April 11, 1972 to May 22, 1972; statements by three males, two 18 years of age and one 31 years of age, that, *inter alia,* in sexual situations with complainant she had refused to let them touch her breasts; a statement by an 18-year-old male that he had seen complainant's father beat her; a photograph in *Mixer* magazine, allegedly of complainant, which accompanied a

solicitation for women to participate in sexual activity; and the minutes of a preliminary hearing held on May 12, 1975. The trial court held a brief hearing in the presence of the prosecution and defense counsel and then, at the request of defense counsel, who were hesitant to open their files to the prosecution, the trial court made an *in camera* examination of the documentation offered by the defense. The trial court concluded that the proffered evidence was inadmissible.

The underlying facts are succinctly set forth in the opinion of Mr. Justice O'CONNOR. There was, however, additional evidence at the trial which supported the ruling that the proffered evidence was inadmissible. It is clear from the record that complainant went directly to the Raber home after leaving the Mandel residence. Lila Raber testified that when she opened the door to her home the complainant "fell in". The complainant, naked below the waist, was shaking uncontrollably. Her feet were dirty and her legs were scratched. The crime was immediately reported to the police. Several police officers arrived at complainant's home shortly after complainant was carried there by her father from the Raber home. In short, the officers described complainant as being in an extreme state of hysteria reaction, emotional, upset and unable to answer questions. Complainant was crying, her hair was disheveled, her face was swollen and her legs were bruised. The complainant was taken to the Peninsula General Hospital emergency room by the police that night. The examining physician testified that complainant was terrified, nervous and shaky. Both sides of her head were tender and her forehead was bruised. There were also scratch marks on her chest and abdomen which could have been made by a nail or claw. There were contusions, abrasions and bruises on her elbows, knees, legs and feet. The pelvic examination revealed swelling and laceration of the left labia major. Complainant's hymen had been recently torn and was bleeding; the physician noted that this did not mean that complainant had been a virgin prior to the crime.

The fact that the crime was immediately reported to the police, the discovery of blood stains and complainant's clothing in the Mandel home and the incredible nature of the defense firmly support the jury's verdict.

Defendants allege numerous grounds for reversal, but their basic position is that the trial court's refusal to admit certain evidence deprived them of the opportunity to confront the

principal prosecution witness and that this violated their rights under the Sixth Amendment.

Defendants' offer of proof consisted, in part, of what they characterize as evidence of three prior similar false rape complaints made by the complainant. Defendants contend that such evidence was not offered merely to impeach the witness, but to show independently that the crimes of which they were accused had not been committed (*People v Hurlburt,* 166 Cal App 2d 334; 3A Wigmore, Evidence [Chadbourn rev], § 963). Although the principle relied on by defendants has merit (cf. *People v Molineux,* 168 NY 264; *People v Mann,* 31 NY2d 253; *People v La Rue,* 47 AD2d 649), the argument is unpersuasive in this case.

The evidence of three prior "similar false rape complaints" consisted of (1) a statement by the defense that one referred to in the opinion of Mr. Justice O'CONNOR as witness "A" would testify that complainant's father had informed him that complainant had told her father that a former employer of complainant had attempted to rape her; (2) a statement signed by one referred to in the opinion of Mr. Justice O'CONNOR as witness "B" that in December, 1973, complainant had come to her door around midnight asking for help and alleging that someone had attempted to rape her and (3) 14 police reports prepared between September 11, 1974 and April 17, 1975 which concerned an attempted rape complaint which was reported by her to the police, and the subsequent police investigation. The statement of witness "A" is hearsay and does not fall within any exception to the hearsay rule. The statement by "B" was rebutted by the complainant, who testified at the preliminary hearing that "B's" statement referred to the rape attempt reported by complainant to the police. Defendants made no effort to verify "B's" recollection of the specific date. The police reports indicate that the police actively investigated the case for eight months but were unable to gather enough information from complainant or others to identify the perpetrator. There was no evidence that the rape occurred in a fashion similar to that alleged in the instant case and there is no evidence that the complaint was false. In fact, the police department's active investigation of the complaint supports an inference that the complaint was genuine (*People v Rincon-Pineda,* 14 Cal 3d 864). Since the offer of proof did not consist of evidence that the accusation was false, such evidence was properly excluded and cross-

examination curtailed because of the prejudicially immaterial implications of the questions *(People v Pacheco,* 220 Cal App 2d 320).

Defendants' offer of proof also consisted of records of South Oaks Hospital prepared in the normal course of business while complainant was a patient at that hospital from April 11, 1972 to May 22, 1972. Although such records were probably not envisioned as coming within the ambit of CPL 60.42, it was proper to exclude them pursuant to that section because they were replete with references to complainant's sexual history. At the trial, defendants were permitted to cross-examine complainant concerning her mental history and condition as reflected by the hosptial records. Complainant testified that she was hospitalized against her will subsequent to a suicide attempt, that she underwent electroshock therapy, that she would stay in one position and stare into space for long periods of time, that she was given medication and that she was presently under the care of a psychologist.

Although objections to other questions regarding complainant's mental history were sustained, and despite complainant's lack of candor in responding to other questions, the defense amply presented and emphasized complainant's mental history. Indicative of a multitude of assertions by defense counsel is a statement in the opening remarks that complainant's testimony would consist of "half truths told by a girl who is * * * and has been for a long time emotionally disturbed, schizophrenic, detached from reality." In summation, defense counsel emphasized that complainant "spent approximately a year in a mental institution", that she was "emotionally disturbed", "had a hallucination over two things", had a "tortured mind", and "unfortunate history of mental illness", is "psychotic" and "mentally disturbed." The defense was also able to elicit from Edward Spierer, a witness for the defense, a statement that "this girl is mentally sick." While these statements by defense counsel certainly could not have had the same impact as the admission of the hospital records themselves, coupled with complainant's testimony, they adequately apprised the jury of complainant's mental history. The mental history and condition of a witness is relevant not only as to credibility, but also to the ability to perceive and remember events *(People v Rensing,* 14 NY2d 210). Where cross-examination of a witness apprises the jury of facts which allow it to assess and evaluate the testimony in the light of such facts, it

may, as here, be proper to exclude the actual hospital records *(People v Kampshoff,* 53 AD2d 325). Although the trial court might have been overzealous in its effort to restrict prejudicial and immaterial cross-examination, the jury was clearly made aware that the complainant's testimony did not necessarily merit the same credibility as that of a normal individual. The manner and extent of cross-examination lies largely within the discretion of the trial court and its rulings are not subject to review unless it clearly appears that the discretion was abused *(People v Duffy,* 36 NY2d 258; *People v Schwartzman,* 24 NY2d 241).

The defense also offered three affidavits by individuals who asserted that in sexual situations with complainant she had refused to let them touch her breasts. Those statements, made by friends or acquaintances of defendant Mandel, were not only given to the same private investigator, but are nearly identical in substance and tone. Not only do these affidavits represent the very type of evidence which the Legislature has determined should be inadmissible (see memorandum of Assemblyman Fink, NY Legis Ann, 1975, pp 47-48), but a reading of them demonstrates their unreliability; in addition, if complainant were as sexually promiscuous as is averred in those affidavits, it is highly unlikely the her hymen would have been recently torn and bleeding.

Defendants also offered an affidavit to the effect that complainant's father had been beating her with his fists on an occasion prior to the date of the crime herein. Defendants offered this affidavit to support their argument that complainant's injuries were the result of a beating by her father. The sequence of events indicates that complainant's father had no opportunity to beat her prior to her examination at Peninsula General Hospital. Although there was testimony that complainant's nose was broken subsequent to the crime, there was ample evidence of assault and defendants were not prejudiced by the exclusion of this testimony.

Contrary to the holding of the majority, I believe that our decision in *People v Hamlin* (58 AD2d 631) is not controlling. Unlike the facts in *Hamlin,* where the alibi witnesses had either refused to answer a prosecutor's question in the witness room or respond to a subpoena, here they agreed to speak to the prosecutor only at the office of defense counsel. Even were it held error to elicit such facts, I note that in *Hamlin* the majority stated (p 632): "Had the evidence of guilt in this case

been overwhelming and the actions of the prosecutor restricted to one or two occasions, we might have affirmed the judgment of conviction on the ground that defendant had not been substantially prejudiced". Here, the proof of guilt was overwhelming, the instructions to the jury were fair, the summation temperate and no objection was taken.

HOPKINS, J. P. (dissenting). I concur in the dissenting opinion of Mr. Justice MARTUSCELLO and add only the following:

1. I am persuaded by the trial record that the material in the hospital records reflecting the psychiatric history of the complainant and the issue of its effect on her testimony were adequately presented to the jury. First, the complainant was a patient in the South Oaks Hospital for about six weeks nearly three years before the occurrence of the incident out of which the charges against the defendants arose. Thus, whatever force the information in the hospital records may have had concerning the then mental condition of the complainant was attenuated by the passage of time in its relevance to her current mental condition.

Second, the admissibility of the hospital records per se is not clear. Without doubt, a defendant may introduce hospital records as evidence of his insanity (*People v Kohlmeyer*, 284 NY 366), and, to an extent, hospital records may be considered as evidence of sanity when introduced against a defendant (*People v Samuels*, 302 NY 163, 170-172). But when hospital records are offered to test the credibility of a witness against a defendant, leaving aside the question of privilege, the use of the hospital records should be restricted to cross-examination (*People v Bartholomew*, 73 Misc 2d 541, affd 56 AD2d 633). The hospital records were available to the defense, and the complainant was, in my view, fairly confronted by the statements contained in those records. The area of cross-examination is, of course, within the discretion of the Trial Judge, and the trial record does not show that this discretion was not properly exercised (cf. *People v Tice*, 131 NY 651).

2. The defendants have also raised the constitutionality of CPL 60.42, calling our attention to *State v Jalo* (27 Ore App 845), which holds unconstitutional an Oregon statute (Ore Rev Stat, § 163.475, subd [3]), providing that evidence of previous sexual conduct of a complainant may not be admitted into evidence. But I do not think that CPL 60.42 is comparable to the Oregon statute. As it appears in the opinion of the court, the Oregon statute completely bars any such evidence. Under

the New York statute the evidence of a victim's sexual conduct may be admissible under certain conditions, or when the trial court so determines after an *in camera* hearing—a procedure followed here. That, in my opinion, is a significant difference which strongly supports the constitutionality of CPL 60.42.

As Judge CARDOZO has stated in an oft-cited passage, the traditional rules of evidence permitted evidence on behalf of a defendant prosecuted for rape that the complainant's reputation for chastity was bad, but did not permit proof of specific acts of unchastity (Cardozo, Nature of Judicial Process, pp 156-157; cf. 3A Wigmore, Evidence [Chadbourn rev], § 924a). The traditional rules have been heavily criticized (see, e.g., Note, The Victim in a Forcible Rape Case: A Feminist View, 11 Am Crim L Rev [ABA], 335; Bohmer, Judicial Attitudes Toward Rape Victims, 57 Judicature 303; Note, Limitations on Right to Introduce Evidence Pertaining to Prior Sexual History of the Complaining Witness in Cases of Forcible Rape: Reflection of Reality or Denial of Due Process, 3 Hofstra L Rev 403; Comment, Rape and Rape Laws: Sexism in Society and Law, 61 Calif L Rev 919; Comment, The Rape Victim: A Victim of Society and Law, 11 Willamette LJ 36). CPL 60.42 was doubtless enacted to meet that criticism.

The claim of unconstitutionality rests on the right of the defendant in a criminal prosecution to confront his accusers (*Davis v Alaska,* 415 US 308). The question essentially is whether the defendant has been so deprived of the right of cross-examination that his defense cannot be adequately presented. Justice HARLAN considered that the defendant's rights were more properly based on due process—whether he had received a fair trial (see *California v Green,* 399 US 149, 174; *Dutton v Evans,* 400 US 74, 94-100; cf. *Dixon v United States,* 287 A2d 89 [DC Ct of App], cert den 407 US 926). Whether cross-examination is unduly narrowed under due process or the right of confrontation seems immaterial in deciding the ultimate question—whether the defense was prevented from presenting relevant facts and circumstances favorable to the defendant at the trial. In *Davis (supra),* for example, the Alaskan statute conferring confidentiality on juvenile delinquent status stopped cross-examination into the prosecution's witness' bias or motive; in *Chambers v Mississippi* (410 US 284), a State evidentiary rule prohibited a party from impeaching his own witness. In both instances the State statute

and rule were held to impede the exercise of the defendant's right of cross-examination.

CPL 60.42 provides, as noted before, for no such iron prohibition of cross-examination. The sexual conduct of a complainant may have more or less probative force, depending on the circumstances. Clearly, evidence of previous sexual intimacy with the defendant has large probative effect; evidence of sexual encounters, remote in time, with other persons has little or no probative effect. The right of the defendant to make an offer of proof away from the jury before the Trial Judge *in camera* allows for a discerning evaluation of the probative force of the evidence proffered by the defendant, and thus, preserves the constitutionality of the New York statute (see, for analysis, Rudstein, Rape Shield Laws: Some Constitutional Problems, 18 Wm & Mary L Rev 1).

3. Finally, I must note that the jury, in acquitting the defendants of rape and sodomy but determining that they were guilty of sexual abuse in the first degree, used a discriminating judgment. It followed the physical proof indicating no evidence of rape or sodomy, but indicating severe injuries reflecting sexual abuse. On the whole, I am of the opinion that the defendants had a fair trial.

MARGETT, J., concurs with O'CONNOR, J.; RABIN, J., concurs in the result, with an opinion; MARTUSCELLO, J., and HOPKINS, J. P., dissent and vote to affirm the judgments, with separate opinions, each of them concurring in the opinion of the other.

Two judgments of the Supreme Court, Queens County, rendered December 9, 1975 (one as to defendant Mandel and one as to defendant De Vito) and judgment of the same court, rendered January 6, 1976 (as to defendant Buckley), reversed, on the law, and new trial ordered. The findings of fact are affirmed.